66 A.3d 1022

In re ASHLEY S. & Caitlyn S.

No. 4, Sept. Term, 2013.

Court of Appeals of Maryland.

May 30, 2013.

680

682

Nenutzka C. Villamar, Assistant Public Defender, (Paul B. DeWolfe, Public Defender, Baltimore, MD), on brief, for Appellant.

Amy L. Petkovsek, Senior Attorney, (Lindsey E. Brecher of Legal Aid Bureau, Inc., Riverdale, MD; Janet Hartge, Assistant Director of Advocacy for Children's Rights, Legal Aid Bureau, Inc., Baltimore, MD), Leslie K. Ridgway, Assistant Attorney General, (Douglas F. Gansler, Attorney General of Maryland, Baltimore, MD), on brief, for Appellees.

Argued before BELL, C.J., HARRELL, BATTAGLIA, GREENE, ADKINS, BARBERA, and McDONALD, JJ.

McDONALD, J.

A parent has a fundamental right to rear his or her children without unwarranted interference by the State. This liberty interest, protected by the Fourteenth Amendment to the United States Constitution,[1] occupies "a unique place in our legal culture, given the centrality of family life as the focus for

---

1. *Pierce v. Soc'y of Sisters,* 268 U.S. 510, 534–35, 45 S.Ct. 571, 69 L.Ed. 1070 (1925).

personal meaning and responsibility" and is "essential to the orderly pursuit of happiness."[2] But this right is not absolute. It must be balanced against society's obligation, exercised through the State, to ensure the child's welfare.[3]

In this case, two young sisters who had been the subject of various reports of neglect by their mother over a period of two years were placed in emergency shelter care by the juvenile court at the request of the county department of social services. The girls were later determined to be children in need of assistance ("CINA") by the court, and, as a result, were placed in foster care, pending implementation of a plan for their permanent placement—a plan that preferably would result in family reunification.

After the girls had been in foster care for nearly a year, the Court of Special Appeals reversed the juvenile court's decision with respect to the CINA designation of the younger sister, and the foster care placement of both girls, due to the insufficiency of the court's factual findings.

After the intermediate appellate court's decision, the juvenile court, at the request of the department of social services, again determined that the younger sister was a CINA—a determination that the mother did not appeal. A few months later, the juvenile court again took up the matter of deciding on a plan for the girls' permanent placement. In doing so, the court considered both their positive experiences with their foster parent and their mother's failure to cooperate with court orders and social workers during the entire period in which the children were in foster care—including both the seven and a half months under the order that had been reversed, as well as the subsequent seven months when the

---

2. *In re Adoption/Guardianship No. 10941*, 335 Md. 99, 113, 642 A.2d 201 (1994) (quoting *Lassiter v. Dep't of Soc. Servs.*, 452 U.S. 18, 38, 101 S.Ct. 2153, 68 L.Ed.2d 640 (1981) (Blackmun, J., dissenting)).

3. *In re Yve S.*, 373 Md. 551, 569, 819 A.2d 1030 (2003) ("the State's interest is to protect the child's best interest as *parens patriae*—a derivation of the State's interest in protecting the health, safety, and welfare of its citizenry" (internal citations omitted)).

girls were in foster care under an order that had not been challenged. As a result, the court approved a change of the permanency plan from reunification with the mother to adoption for both girls.

The mother contends that the court should not have considered—or, at least, should have significantly discounted—the events that took place during their foster care placement under the original order that was reversed. We do not agree, and hold that the juvenile court, in determining the girls' permanency plan, properly regarded all the relevant circumstances and facts before it in reaching a decision that was in the children's best interests.

## Background

*CINA—Statutory Framework*

Procedures governing the designation of a child as CINA are set forth in Maryland Code, Courts & Judicial Proceedings Article ("CJ"), § 3–801 *et seq.* Related provisions concerning out-of-home placement and foster care are found in Maryland Code, Family Law Article ("FL"), § 5–524 *et seq.*

When a child suffers abuse or neglect or has a developmental or mental disability and lacks a caretaker to give proper attention to his or her needs, a local department of social services may petition the juvenile court for a determination that the child is a CINA. CJ §§ 3–801(f), 3–809(a). Upon receipt of a petition, the court is required to hold an adjudicatory hearing to determine whether the department's factual allegations are true. CJ §§ 3–801(c), 3–817(a). If the court finds that the allegations are accurate, a disposition hearing is held to determine whether the child is, in fact, a CINA, and, if so, what intervention is necessary to protect the child's health, safety, and well-being. CJ §§ 3–801(m), 3–819(a).

Once the court determines that a child is a CINA, it may leave the child in the child's current custody; commit the child to the custody of a parent, a relative, or another suitable individual; or commit the child to the custody of the local department of social services or the Department of Health and Mental Hygiene for placement in foster, kinship, group, or

residential treatment care. CJ § 3–819(b)(1)(iii); FL §§ 5–501(m), 5–525(b). If the child is committed to the local department for out-of-home placement, the court must hold, within 11 months, a hearing to determine a "permanency plan" for the child. CJ § 3–823(b)(1). This establishes "the direction in which the parent, agencies, and the court will work in terms of reaching a satisfactory conclusion to the situation." *In re Yve S.*, 373 Md. 551, 582, 819 A.2d 1030 (2003). It is an integral part of "the statutory scheme designed to expedite the movement of Maryland's children from foster care to permanent living, and hopefully, family arrangement." *In re Damon M.*, 362 Md. 429, 436, 765 A.2d 624, 627 (2001).

A permanency plan may include reunification of the child with the parent or guardian (unless the local department is the guardian); placing the child with relatives for custody or adoption; custody or adoption by the current foster parent or other approved adoptive family; or another appropriate permanent living arrangement. FL § 5–525(f)(2); CJ § 3–823(e)(1). *In* developing a permanency plan, the juvenile court is to give primary consideration to the "best interests of the child." *Id.* The statutes specify certain factors to guide the analysis:

(i) the child's ability to be safe and healthy in the home of the child's parent;

(ii) the child's attachment and emotional ties to the child's natural parents and siblings;

(iii) the child's emotional attachment to the child's current caregiver and caregiver's family;

(iv) the length of time the child has resided with the current caregiver;

(v) the potential emotional, developmental, and educational harm to the child if moved from the child's current placement; and

(vi) the potential harm to the child by remaining in State custody for an excessive period of time.

FL § 5–525(f)(1); CJ § 3–823(e)(2).

■ The statutory scheme presumes that, "unless there are compelling circumstances to the contrary, the plan should be

to work toward reunification, as it is presumed that it is in the best interest of a child to be returned to his or her natural parent." *In re Yve S.*, 373 Md. at 582, 819 A.2d 1030. However, a plan other than reunification is appropriate where "weighty" circumstances require such a modification. *In re Adoption/Guardianship of Cadence B.*, 417 Md. 146, 157, 9 A.3d 14 (2010) (citing *In re Adoption/Guardianship of Rashawn H.*, 402 Md. 477, 496, 937 A.2d 177 (2007)).

A review hearing concerning the permanency plan is to be held at least every six months for updates and amendments to the original plan. CJ § 3–823(h). At the hearing, the juvenile court is to assess the continuing necessity for, and appropriateness of, the prior commitment of the child; whether reasonable efforts have been made to finalize the child's permanency plan; the extent of progress in alleviating or mitigating the parent's problems; a reasonable date by which the child may be returned home, placed in a pre-adoptive home, or placed under legal guardianship; and the safety of the child and any measures needed to protect the child. CJ § 3–823(h)(2). The court is to change the permanency plan when it would be in the child's best interests to do so. CJ § 3–823(h)(2)(vi).

If the court approves a permanency plan of adoption, the local department must file a petition for guardianship within 30 days (or 60 days if the department does not support the plan), and a hearing on termination of parental rights is held in lieu of the six-month review hearing. CJ § 3–823(g).

*Ashley S. and Caitlyn S.*

Ashley S. was born to Sharee S. ("Ms.S.") [4] on July 8, 1999. Caitlyn S. was born to Ms. S. on February 8, 2008. The girls have different fathers, neither of whom is a party to this appeal. Their situation comes before this Court after numerous contacts with the Montgomery County Department of Health and Human Services ("the Department"), a series of

---

**4.** The mother's first name is given a variety of spellings in the record. Her counsel advises that the correct spelling is "Sharee."

CINA hearings in the juvenile court, and an earlier appeal to the Court of Special Appeals. Due consideration of the determinations of those courts requires that we recount that journey in some detail.

*September 2008—January 2011: Several Safety Plans*

In September 2008, Ashley and Caitlyn—then ages 9 years and 7 months, respectively—came to the attention of the Department after reports that their mother had been leaving them alone after school and on weekends for a month. As a result of that neglect, Ms. S. was arrested for criminal neglect, a "no-contact" order was issued,[5] and the children were removed from the home. After Ms. S. agreed to a written "safety plan" to provide appropriate supervision for the children, they were returned to her. Subsequently, officials at Ashley's school became increasingly concerned about her behavioral problems. That year, the school referred Ashley to a crisis center after she expressed suicidal thoughts. Although Ms. S. took Ashley to the center, they left before Ashley received any treatment.

In May 2009, Ashley was caught stealing her teacher's mobile phone—Ashley's third disciplinary incident at the school related to theft. The school principal met with Ms. S. and told her that the matter had been referred to the police and that Ashley was facing suspension.[6] The principal suggested to Ms. S. that, as an alternative to this outcome, Ashley be enrolled in a youth support program called "Maryland Choices." Ms. S. instead offered to place Ashley in a therapy program through her church. The principal tentatively agreed to this plan, provided that Ms. S. delivered proof of Ashley's participation.

---

**5.** The later CINA petition referenced the "no contact" order issued to Ms. S. in conjunction with her criminal neglect charges, but the record does not reflect which court issued that order or a specific description of the order.

**6.** After the two prior theft incidents, the principal had suggested to Ms. S. that Ashley meet with a school counselor, but Ms. S. refused.

During this time, Ashley reported to the school that her mother hit her with a belt and a closed fist, and physically disciplined Caitlyn as well. Ashley said she was scared of her mother and did not want to go home. These allegations were forwarded to the Child Welfare Services division of the Department, which began an investigation on May 20, 2009. Ashley confirmed her earlier statements to the agency. Following numerous unsuccessful attempts by the agency to contact Ms. S., a meeting was finally held in July 2009, after which Ms. S. agreed to a second safety plan under which she would cease physical discipline of her children and would have Ashley assessed for therapy. Ms. S. did not follow through with these promises, but Child Welfare Services closed the case after Ashley subsequently reported that there were no further problems in the home.

In December 2010, Ashley told school officials that the family was often staying in hotels or at friends' homes because her mother was concerned that people were watching or following them; her mother also sought to avoid "strange calls" by refusing to answer the telephone.[7] The Department was contacted and the investigation was referred to Melanie Rabkin, a social worker with Child Welfare Services. On January 3, 2011, after unsuccessful attempts to reach Ms. S., Ms. Rabkin interviewed Ashley, who related that her mother continued to hit her with a belt and had hit Caitlyn with her hand; Ashley also further described her mother's belief that they were being pursued by her co-workers. Ms. Rabkin described Ashley's demeanor at this time as "quiet" and "sad."

Ms. S. thereafter agreed to yet another safety plan, under which she would obtain an attorney, discuss Ashley's educational needs with her teachers, and arrange for Child Welfare Services to meet with Caitlyn. However, Ms. S. did not respond to follow-up phone calls and e-mails.

---

**7.** By this time, Ms. S. had also failed to provide the school with proof of Ashley's participation in her church's program that Ms. S. had promised more than a year earlier.

*February 2011: Emergency Shelter Care and Initial CINA Petitions*

Ashley failed to attend school during the second half of January 2011. On February 1, after the Department was unable to locate either child, it filed petitions with the Circuit Court for Montgomery County, sitting as a juvenile court, to have the sisters designated as CINA. On February 7, the Department located the children and learned that Ms. S. had withheld Ashley from school since January 19 without notifying school authorities. At that point, Ashley had missed more than 20 percent of the school year and was considered by the school to be a truant.

On February 7, 2011, the Department immediately filed a request for emergency shelter care—*i.e.*, the temporary placement of a child outside of the home before the determination or disposition of CINA status. CJ § 3–801(y). The request was granted by the juvenile court the following day. Citing "the emergent nature of the situation" because the mother had taken the girls out of the state for weeks without informing the Department, and noting the Department's concern that the mother would do this again, the court on February 10, 2011 placed the children in the temporary care and custody of the Department with limited visitation by Ms. S. After the Department took custody of the girls, it was discovered that Caitlyn had experienced a hearing loss that had gone untreated. The Department filed amended CINA petitions with respect to the girls on April 8, 2011.

*April—May 2011: Initial CINA Adjudication Hearing*

The juvenile court held an adjudicatory proceeding on the CINA petition over the course of several days in late April and early May, 2011. At the hearing, three witnesses from Ashley's school testified—the school principal, one of Ashley's special education teachers, and a counselor. They described her school absences and related academic struggles, problems at home, melancholy moods, and difficulties with socialization.

Ashley's teacher assessed her as two years behind in math and one year behind in reading. Improving Ashley's grades

was "an uphill battle," the teacher testified, and the educational gap between her and her peers was growing because of her excessive absences.

In response to Ashley's poor grades, the principal testified, meetings had been held at the school to determine accommodations and services that could be provided to help her improve. It was proposed that Ashley be assessed for an individualized education plan. Ms. S., however, had opposed this idea and denied that Ashley had special education needs. After Ashley had been placed in emergency foster care, the assessment had been approved by court order. Ashley was given small-group instruction and extra time to complete her assignments with tutors, and she participated in a reading comprehension group.

The teacher testified that, after being placed in foster care, Ashley had begun studying, preparing for tests, and completing her homework. As a result of the accommodations she had received and her improved school habits, Ashley was showing progress in her assessments and getting better grades.

The school counselor testified about Ashley's home life, particularly Ms. S.'s use of physical discipline and Ms. S.'s stated fears about being followed that caused her to take the girls to stay in hotels. During Ashley's three-week absence from school that winter, Ms. S. had taken her children on a trip to visit relatives in New York, New Jersey, and North Carolina, although Ashley said she would have preferred to stay in school. Ashley had told the counselor that she no longer wished to live with her mother.

The teacher described Ashley's demeanor while she was living with her mother. She characterized the child as "irritable," "tired," "moody," "quiet," "withdrawn," and unresponsive to questions. In general, the teacher said, Ashley had acted as if she "wanted to be left alone." The teacher was also concerned about Ashley's hygiene and appearance, noting that she often wore clothes that were too small. By contrast, while in foster care, Ashley's attitude had improved; recently, Ash-

ley had made friends and was "beaming," "happy," "laughing," and "cracking jokes with some of the students."

A therapist for the Department, who was accepted by the juvenile court as a mental health expert, testified that Ashley was experiencing "ongoing trauma." The therapist diagnosed Ashley with adjustment and learning disorders, anxiety, and depression; Ashley also showed signs of attention deficit hyperactivity disorder and post-traumatic stress disorder. The witness recommended therapy and further psychological assessment.

Ms. S. also testified at the hearing. With regard to her disciplinary methods, she said that she resorted to corporal punishment with a belt only after discussion and non-physical punishment proved unsuccessful at ending a child's bad behavior. Although she admitted that there were "gaps in Ashley's education," Ms. S. stated that she opposed the school's recommendation for an assessment and an individualized education plan because Ashley's problems were not "to the extent where she couldn't grasp the concept" and a private tutoring center could provide any needed services.

Ms. S. explained that she took the girls on the three-week out-of-state trip because "of a number of snowstorms," intermittent school closings, and the lack of power in her house. She said that the children wished to see their relatives and described Ashley as "very upbeat" and "very excited" about the trip. Ms. S. admitted that she should have notified the school that Ashley would be absent and to obtain school work for the time away. She also acknowledged that Ashley should not have missed so much school and promised to "make every effort" to ensure her future attendance.

Ms. S. denied telling Ashley that they were being followed. She stated that she often bought Ashley new clothes and that Ashley generally dressed appropriately, except when she chose not to "wear the clothing that she had available to her" in favor of older clothing. In discussing her visits with the children since she had lost custody of them, Ms. S. said that Caitlyn was happy to see her and Ashley was also increasingly

willing to engage in conversation. At the end of one visit, Ms. S. related, Caitlyn cried "incessantly" because she wanted to go home with her mother.

*May 2011: Initial CINA Disposition and Permanency Plan—Appeal*

On May 10, 2011, the court entered an order finding that the Department had proven the allegations of neglect in its CINA petition. Based on that determination, on May 18, the court designated both children as CINA and committed them to the Department for placement in foster care. The court established the girls' permanency plans as reunification with Ms. S. and expressed hope that Ms. S. would quickly resolve all safety concerns so that she could regain custody within a few months.

Ms. S. appealed the order to the Court of Special Appeals.

*October 2011: Permanency Planning Hearing*

While Ms. S.'s appeal was pending, the juvenile court conducted a permanency planning hearing on October 21, 2011. Ms. S. failed to appear, although her counsel was present. The Department recommended to the court that the children remain in its custody, with supervised visitation by Ms. S. A Department social worker, Stephanie Madrigal, who had been assigned to the girls' case since April, testified that, since the proceedings in April 2011, Ms. S. had refused to address any of the court's safety concerns. Among other things, she had failed to provide the Department with her address so that a home assessment could be conducted.

Ms. Madrigal said that, in July 2011, she had attempted to conduct a home visit at an address provided by Ms. S., but discovered that Ms. S. did not actually live at that address. Ms. S.'s written communications to Ms. Madrigal were, as she described in a report entered in evidence, often "not understandable" and, when the two had verbal conversations, Ms. S. talked "to make her own point known without hearing or responding" to Ms. Madrigal's inquiries. Ms. S. seemed unwilling to discuss anything with the Department other than her visitation appointments.

Ms. Madrigal further testified that Ms. S. was chronically late—ranging from 10 minutes to 90 minutes—for visits with the girls, which had a negative impact on them. According to Ms. Madrigal, Ashley became withdrawn when Ms. S. failed to show up on time; at one point, when Ms. S. called to say she would be an hour late, Ashley asked for her foster mother, Andrea W., to come pick her up. According to Ms. Madrigal, Ashley was "reserved" and "apprehensive" during the visits, and "hesitant about her mom being critical of her." While Caitlyn had initially enjoyed the visits, she was also increasingly losing interest in them.

Ms. Madrigal said that Ms. S. was late to other important events as well. When Ms. Madrigal arranged to be present at Ashley's graduation from the sixth grade so that Ms. S. could also attend,[8] Ms. S. arrived more than an hour after the ceremony began. Ms. S. also refused to attend Ashley's individualized education plan meetings.

Ms. S. also failed to make or attend appointments for other court-ordered tasks. Although Ms. Madrigal had set up times for a psychological evaluation and informed Ms. S. of those times, Ms. S. did not respond and never appeared for the assessments. Ms. S. did not arrange for the girls' medical examinations and provided the Department with a false address of where they would be receiving care. As a result, Caitlyn's hearing loss had continued to go untreated. Ms. S. did take Caitlyn to see an eye doctor, but did not obtain the glasses or provide the Department with the eyeglass prescription for the child. At one point, the Department transported Ashley to an orthodontic appointment that Ms. S. had claimed to have made, only to find that the orthodontist's office was closed. Ms. S. later e-mailed to say that she had made and rescheduled the appointment, but that turned out to be untrue.

---

8. Per order of the court, Ms. S. was not permitted to interact with the children without authorized supervision.

At the hearing, the court found that the girls had done well in more than eight months of foster care, particularly Ashley, who had received tutoring and made the honor roll for the first time. Ashley had also enrolled in an after-school program, attended summer camp, begun participating in a soccer league, and taken swimming and guitar lessons.

By contrast, the court described Ms. S. as being "far down in the hole," but expressed hope that "she can climb back out." The court entered an order maintaining the initial permanency plans of reunification of the girls with their mother, stating, "I'd like that to be the . . . successful plan." The court further ordered that Ms. S. give the Department her address and allow a home visit; set up an appointment for Caitlyn with an ear, nose, and throat specialist; and schedule a psychological evaluation for herself.

*November 2011: Partial Reversal of Original CINA Order on Appeal*

On November 28, 2011, the Court of Special Appeals, in an unreported decision, decided Ms. S.'s appeal of the original CINA determinations. The intermediate appellate court affirmed the juvenile court's determination that Ashley was a CINA, but held that the juvenile court had abused its discretion in determining Caitlyn to be a CINA and in committing both girls to foster care. The intermediate appellate court held that the juvenile court had made "insufficient findings" to support a determination that Caitlyn was a CINA or that Ms. S. could not care for both girls. The Court of Special Appeals observed, however, that if "there has been a change in circumstances since the May 2011 order [which was the subject of the appeal], which causes the Department to believe that returning Ashley to Ms. S. is not warranted at this time, the Department is free to file whatever pleadings it deems appropriate." The mandate issued on December 28, 2011, and was docketed on January 5, 2012.

*January 2012: Second CINA Petition and Emergency Shelter Care Proceedings*

In accordance with the decision of the Court of Special Appeals, the juvenile court on January 9, 2012, dismissed the

Department's original CINA petition as to Caitlyn. The Department did not, however, return the children to the custody of Ms. S., who had still not provided a home address. Rather, in the belief that the children could not safely return to Ms. S.'s care at that time, the Department filed an emergency motion the next day in Ashley's CINA case to authorize her continuing placement in foster care. The motion was granted by the court. The Department also filed a new CINA petition with respect to Caitlyn and requested a shelter care order also authorizing her continued placement in foster care.

The juvenile court held hearings in both matters over three days in mid-January 2012. On the first day of the hearing, Ms. S. refused to answer questions about where she lived, or even where she had spent the previous night. She admitted that she did not have a permanent address and was keeping some of her belongings in her car. She asserted that for the previous six weeks she had been living in different locations in Chevy Chase and Rockville—including the residence of a family friend that she could not name—but claimed not to know specifically where she had stayed. Ms. S., who testified that her income was between $65,000 and $70,000 a year, stated that she planned to rent an apartment in Chevy Chase where she had kept some of her belongings the previous night, but did not know exactly where that apartment was located.

A few days later at a continuation of the hearing, Ms. S. testified that she had obtained housing but that the rental office of her apartment building still had "concerns" that she needed to address. Eventually, Ms. S. admitted that she had not actually arranged for housing because of bills she needed to pay, including $150 a month in student loans, as well as expenses related to the girls' education. On that occasion, Ms. S. testified that she did not remember what her salary was but said that she could afford rent up to $2,000 a month. Ms. S. also stated that she was keeping her furniture in a rented U–Haul truck that she moved from place to place.

Citing Ms. S.'s testimony as well as facts established in the previous hearings concerning the girls, the juvenile court

found that Ms. S. lacked credibility because she "repeatedly refused to answer questions" and had given "conflicting answers regarding her place of residence, and where her personal belongings, and the children's belongings were located." The court believed that Ms. S. was likely homeless and living out of the U–Haul truck. Ms. S.'s "bizarre and/or illogical reasoning" and "inability ... to grasp reality" further caused the court to question her mental health. The court recognized that, although there had originally been an insufficient basis for Caitlyn's CINA status and the girls' placement in foster care under the initial CINA determinations, it was "impossible to erase" that time and troubling that Ms. S. had failed to comply with court orders during that period.

The court said that it was ultimately persuaded that Ms. S.'s failure to abide by previous court orders—to provide the Department with an address, complete a psychological evaluation, permit the Department to study her home, and undergo family therapy—reflected negatively on her fitness to take care of the children. The court stated that it was "irresponsible ... to return the children unless [Ms. S.] is willing to tell us where she lives." The court thus found that it would be contrary to the welfare of the children to be in their mother's custody at that time and ordered that both girls continue their foster care placement.[9]

*February 2012: Hearings on Caitlyn's CINA Petition and Ashley's Placement*

Over three days in mid-February 2012, the juvenile court held hearings to adjudicate Caitlyn's CINA status and to review Ashley's placement. Ms. S. again refused to divulge her home address, giving 15 different answers about her current living situation. On February 16, the court declared Caitlyn to be a CINA and committed both children to the custody of the Department for placement in foster care. This decision rested largely on the same facts underlying the

---

**9.** Given the procedural posture of the two cases, Caitlyn was technically ordered to remain in shelter care with Ms. W. pending the CINA adjudicatory hearing.

emergency orders, as well as the court's observations that Ms. S. likely had "mental health issues" and that the children were doing particularly well in foster care.[10]

Ms. S. was permitted to have "loosely supervised" visits with the girls at a visitation facility for a minimum of two hours a week. She was also ordered to participate in Ashley's individualized education plan meetings; undergo a psychological evaluation; provide the Department with an updated address, proof of a lease, and a telephone number; permit the Department to make a home visit; and sign releases for the Department to obtain information from the family therapist and psychological evaluator.

The permanency plan for both girls continued to be reunification with their mother. Ms. S. did not appeal the juvenile court's decisions concerning Caitlyn's second CINA designation and the continuation of both children in foster care.

*July 2012: Permanency Plan Review—Change to Adoption*

Five months later, however, the permanency plan changed. On July 26, 2012, the juvenile court held a permanency plan review hearing and interviewed both girls in chambers. Both children favored a change in permanency plan from reunification with Ms. S. to adoption. Ashley said that she was enjoying life with Ms. W., the foster mother, and keeping active with soccer and swimming, an activity in which her sister also participated. Ashley believed her mother—who had told her that she was the only person Ashley could trust—was living in hotels and keeping clothes and toiletries in the back of a car. Ashley told the court that she was concerned that her mother's mental health would continue to deteriorate.

Ms. Madrigal, qualified by the court as an expert in social work and risk assessment, testified at the review hearing that Ms. S. had not completed any of the tasks previously ordered by the court, including arranging mental health treatment for

---

10. For example, the court noted, Caitlyn had recently become more talkative and engaged.

herself and Ashley.[11] To obtain a mental health evaluation for Ms. S., the Department had given her the names of two psychologists that it would pay for, as well as a psychological evaluation resource that would conduct a home visit, but Ms. S. did not set up an appointment. Ms. S. had provided the Department with the address of a psychologist from whom the family would receive therapy, but the address corresponded to that of a parking garage. Moreover, because Ms. S. had not signed a release as the Department had requested, it was unable to obtain any information about what, if any, services she had arranged.

According to Ms. Madrigal, both children experienced anxiety about whether Ms. S. would actually appear for scheduled visits. Ms. S. had missed a total of eight weeks of visits because she had been incarcerated and had not informed the Department of her predicament.[12] Even when Ms. S. did visit the children, they were "apprehensive" and sometimes did not wish the visits to occur. Ms. Madrigal related that the girls experienced anxiety about their uncertain future.[13] Ms. Madrigal concluded that Ms. S. posed a moderate to high safety risk as a parent, which was sufficient to warrant a change in the permanency plan to a goal of adoption.

According to a Department report entered into evidence, Ms. S. was often distracted during the visits by her phone, crossword puzzles, food, or the need to run errands rather than engage with the children. On one occasion, the children reported, their mother fell asleep. Ashley, who complained

---

11. Ms. Madrigal testified that she had previously recommended to Ms. S. that Caitlyn receive individual therapy but Ms. S. had refused to consent. Following the July 2012 permanency plan hearing, the court ordered therapy for Caitlyn.

12. Ms. S. testified that she had been arrested for failure to appear in a previously unmentioned legal matter that the Department later determined were criminal charges, including theft, resisting arrest, and a traffic violation. She eventually was sentenced to probation before judgment on the criminal charges.

13. For example, at one point, Ms. S. told the girls that they would be getting passports because they would all be traveling to Greece.

that her mother often insulted her hair and clothing, typically displayed no affection to Ms. S., choosing instead to play with her phone or listen to music. Ashley requested that the visits be ended.

The juvenile court found that Ms. S. engaged in "inappropriate" interactions with the girls that indicated an "unstable and/or manipulative mental state," which upset them. For example, Ms. S. refused to return Ashley's personal items, electronic devices, or birthday presents to her until she came back into her mother's custody, nor would Ms. S. allow Ashley to get braces until the girls returned home. Ms. S. also frequently promised Caitlyn gifts and toys, but failed to bring them to her.

By contrast, the juvenile court found that, after 14 months with Ms. W.,[14] the girls were happy with, and could rely upon, their foster mother, whom they called "Mama." Caitlyn was attending day care, participating in swimming and gymnastics lessons, and making satisfactory academic and social-progress. Ashley was "thriving" academically under Ms. W.'s tutoring and her individualized education plan at school, which had previously been blocked by Ms. S. Ashley was also undergoing therapy, playing soccer, swimming, and had attended summer camp; she had celebrated her 13th birthday with friends at an amusement park and benefitted from the emotional and psychological stability of her placement.

Although Ms. S. expressed a strong desire at the July 2012 hearing to have Ashley and Caitlyn "returned home immediately," her testimony was rife with the same contradictions and evasions as at prior hearings.

---

14. From February 7, 2011, through July 26, 2012, the girls had actually spent more than 17 months in foster care. Pursuant to CJ § 3-823(b)(2), the juvenile court is to consider the children "to have entered an out-of-home placement 30 days after the child is placed into an out-of-home placement." The juvenile court's permanency plan order states that the girls had been under Ms. W.'s care for 14 months, as the record reflects that the girls initially spent time with another foster-care provider.

For example, Ms. S. had testified in February 2012 that her housing arrangement at an apartment complex in Chevy Chase had fallen through, but now said that she had actually moved into that complex shortly after that hearing and was currently subletting, by oral agreement, from an individual named "Michael" who was associated with an unidentified organization. She said she did not know Michael's last name and was uncertain of the number of the apartment where she had been residing. Ms. S. said she paid Michael $1,700 a month in rent by money order, but had no documentation of those payments. She stated that she had not actually stayed at the apartment during the previous week because of "some activities that were going on" in New York with "close family friends that I've known since I was born who graduated from college," as well as "some personal matters that I've had to address." The court ultimately did not believe that Ms. S. was living, or had ever lived, at the apartment in Chevy Chase.

Ms. S. also said that she did not know the location of where she worked or the telephone number of her supervisor. When asked by the court what she would do with the girls if she was incarcerated again, Ms. S. declined to identify anyone who would take care of the children in her absence.

The court found it troubling that Ms. S. "is not able to follow court orders that she thinks aren't appropriate." She had not produced satisfactory proof that she had stable housing, completed a psychological evaluation, or attended Ashley's individualized education plan or family involvement meetings. The court found that Ms. S. had unaddressed mental health problems, "still is not capable of answering a question directly," and "exhibited a total detachment from reality" on the stand, such that her inconsistent testimony and refusal to answer certain questions indicated untruthfulness, particularly in regards to her current housing situation. The court concluded that, because Ms. S. lacked housing and refused to seek assistance from the Department in finding a stable place to stay, the children had "no home to return to."

The juvenile court also found that the bond between the children and their mother was not healthy. It noted that Ashley, according to Ms. Madrigal, had become "parentified" in that she had assumed a caretaker role in the relationship with her mother. On the other hand, the girls had bonded with Ms. W., who had provided them with stability and dependable care in a loving and supportive home. The court found that the ongoing uncertainty regarding their permanent placement, exacerbated by the mother's continuing assertions that they should return to her care even though she had done nothing to prepare a home for them, carried a "significant" risk of harm.

The juvenile court acknowledged that the girls' original placement in foster care—and, indeed, Caitlyn's original CINA status—had been held by the Court of Special Appeals to have been inadequately supported. The court stated that if it "had seen a glimmer of hope that Ms. S. was making progress, cooperating with the Department, making efforts to do the things that she's been ordered to do repeatedly," it would have been inclined to give Ms. S. "an additional chance" at reunification with her daughters. However, "whatever the legal complications were that required further proceedings, that can't be held to the detriment of the children," who needed to get on "the road to permanency." Accordingly, on July 31, 2012, the court ordered that the permanency plan for both children be changed from reunification to adoption. Supervised visitation was permitted to continue between Ms. S. and the children.

*Late 2012: Second Appeal and Writ of Certiorari*

█ Ms. S. then appealed the juvenile court's orders to the Court of Special Appeals.[15] Prior to argument in that court,

---

**15.** A change in a permanency plan to eliminate reunification with a parent is appealable as an interlocutory order. *See In re Damon M.,* 362 Md. 429, 436–37, 765 A.2d 624 (2001) ("[W]hen the plan is reunification, there necessarily is, on the part of the court and, certainly, the parent, an expectation—more than a hope—that the parent will regain custody. That is, after all, the point of the plan[.] ... The amendment of the permanency plan to long-term or permanent foster

on December 14, 2012, this Court, on its own motion, issued a writ of certiorari to consider whether the juvenile court, in changing the permanency plan for the children to adoption, was entitled to consider the events occurring during the months that the children spent in foster care under the initial court orders that had been reversed by the Court of Special Appeals.

*Pending Appeal: Another Change in Caitlyn's Plan; Petition to Terminate Parental Rights*

Shortly after we issued the writ of certiorari, the juvenile court conducted its six-month review hearing on the girls' permanency plan on December 27, 2012. At that time, the juvenile court changed Caitlyn's permanency plan from adoption to reunification with her father, Fred M., who had recently entered the case.[16] The Department also filed a petition with the juvenile court for termination of Ms. S.'s parental rights, which was later dismissed as to Caitlyn, but not as to Ashley.

Ms. S.'s motion to stay those proceedings until the outcome of this appeal was denied by the juvenile court. She thereafter asked this Court to issue an injunction against further efforts to terminate her parental rights until this appeal was decided. That was also denied.

*Department's Motion to Dismiss Appeal as to Caitlyn as Moot*

In its brief filed with this Court, the Department urged that we dismiss the appeal as regards to Caitlyn as moot, since

_____

care and adoption is a change in the terms of the custody order"). However, subsequent interlocutory orders made in accordance with continuation of the same plan are not appealable because they do not change the terms of parental rights. *In re Samone H.,* 385 Md. 282, 869 A.2d 370 (2005).

16. Fred M. learned during the summer of 2012 that Caitlyn was his daughter. They met for the first time in October 2012. With the Department's support, he is seeking custody of her, although Caitlyn (through counsel) has objected to this idea.

Caitlyn's permanency plan no longer has a goal of adoption. The Department also argued that Ms. S. had consented to the change in Caitlyn's permanency plan from adoption to reunification with her father and had therefore waived any challenge to that change.

## Discussion

In this appeal, Ms. S. argues that the juvenile court, in determining the permanency plans for Ashley and Caitlyn, should not have considered the months that the girls spent in foster care under the order that was later reversed by the Court of Special Appeals. For that and other reasons, she asserts that the juvenile court erred in ordering a plan of adoption for Ashley and Caitlyn. Before we discuss those two issues, we first briefly review the standard of review applicable in CINA cases and address the Department's contention that the appeal as to Caitlyn is moot.

### *Standard of Review*

In CINA cases, factual findings by the juvenile court are reviewed for clear error. An erroneous legal determination by the juvenile court will require further proceedings in the trial court unless the error is deemed to be harmless. The final conclusion of the juvenile court, when based on proper factual findings and correct legal principles, will stand unless the decision is a clear abuse of discretion. *In re Yve S.*, 373 Md. at 586, 819 A.2d 1030.

A juvenile court's ultimate decision to order a permanency plan goal of adoption is reviewed under an abuse of discretion standard. *In re Shirley B.*, 419 Md. 1, 18–9, 18 A.3d 40 (2011). Thus, to be reversed, that decision must "be well removed from any center mark imagined by the reviewing court and beyond the fringe of what the court deems minimally acceptable." *In re Yve S.*, 373 Md. at 583–84, 819 A.2d 1030. But the question whether the juvenile court may consider, in deciding upon a permanency plan, the time that a child has spent in out-of-home placement under a court order

that is later reversed is a question of law, on which we do not defer to the trial court.

### Whether the Appeal as to Caitlyn's Plan is Moot

■ As indicated above, while this appeal was pending, the juvenile court issued an order changing Caitlyn's permanency plan from adoption to reunification with her father.[17] The Department contends that, given that the prior permanency plan determination that Ms. S. challenges in this appeal no longer pertains to Caitlyn, her appeal should be dismissed as moot with respect to Caitlyn. The Department also argues that, as the more recent order indicated that the mother agreed to the current plan for Caitlyn, she has waived her right to challenge it.

■ As to waiver, Ms. S. denies that she consented to the December 2012 change in Caitlyn's plan. A review of the transcript of the review proceeding supports Ms. S.'s contention. At the hearing, Ms. S. did ask that the plan be changed to reunification with a parent, but specifically requested that the change be "without designation as to a specific parent," thus leaving open the possibility of reunification with her. The juvenile court explicitly rejected her request, stating that it wanted to be "clear" that the permanency plan was not reunification with either parent, but "only reunification with Mr. M." Therefore, Caitlyn's permanency plan has not been altered to include a potential restoration of Caitlyn to Ms. S.'s custody. There is no "waiver" by Ms. S. that affects her appeal.

■ It is true that the change in permanency plan from adoption to reunification of Caitlyn with her father did benefit Ms. S. in a certain respect, as the plan no longer contemplates

---

17. A juvenile court may hold a disposition review hearing during the pendency of a CINA appeal and issue orders modifying custody, even where those orders may moot the appeal, as the court has the duty to modify a custody order when necessary to protect the health, safety, and well-being of a child designated as a CINA. *In re Deontay J.*, 408 Md. 152, 164, 968 A.2d 1067 (2009).

termination of her parental rights with respect to Caitlyn. She is therefore in a better position—or, at least, no worse off—following the change in permanency plan to reunification of Caitlyn with her father than she had been beforehand. For that reason, Ms. S. would not be permitted to pursue an interlocutory appeal of the December 2012 change in Caitlyn's permanency plan. *See In re Samone H.*, 385 Md. 282, 869 A.2d 370 (2005).

This Court has previously held that a permanency plan of reunification of a child with a parent, other than the one seeking custody, is a potentially outcome-determinative change from which the custody-seeking parent may appeal. *In re Joseph N.*, 407 Md. 278, 291, 965 A.2d 59 (2009). Therefore, if the juvenile court had, at the July 2012 hearing, changed Caitlyn's permanency plan from reunification with Ms. S. to reunification instead with Caitlyn's father, Ms. S. would have had the right to appeal that change. It would certainly be an odd result if Ms. S. could appeal both a change in permanency plan from reunification with her to adoption or a change from reunification with her to reunification with Mr. M., but could *not* appeal a change to adoption when there is a subsequent change to reunification with Mr. M. The sequential approval of two plans both disadvantageous to her would have the perverse effect of negating her ability to further challenge either one. This would mean that the plan for permanent removal of Ms. S.'s children from her custody would effectively evade appellate review.

Accordingly, we deny the Department's motion to dismiss her appeal with respect to Caitlyn as moot. We will review the juvenile court's July 2012 permanency plan change for Caitlyn without regard to the court's later modification of that plan.[18]

---

18. If we find that change to adoption was within the juvenile court's discretion, then Ms. S. has no further recourse to challenge the subsequent change in Caitlyn's permanency plan from adoption to reunification with Mr. M., as that decision did not negatively affect her parental rights at the time of that change. On the other hand, if we find that the July 2012 change in permanency plan was an abuse of discretion, Ms.

*Whether the Juvenile Court Properly Considered Informa-*
*tion from the Time that Ashley and Caitlyn Spent in Foster*
*Care Pursuant to an Order Reversed on Appeal*

Ms. S. challenges the juvenile court's consideration, in its
July 2012 determination of permanency plans for the girls, of
the more than 16 months that the children had spent in foster
care.[19] As an initial matter, this appears to be an overstate-
ment of the time in question. Ashley and Caitlyn were found
to be CINA and committed to long-term foster care on May
18, 2011; prior to that time they were in emergency shelter
care. The Court of Special Appeals' mandate to the juvenile
court—to reverse Caitlyn's CINA finding and the order plac-
ing both children in foster care—was docketed on January 5,
2012.

Within days of the appellate mandate, the Department filed
a new CINA petition for Caitlyn and requested that both girls
remain in foster care. The juvenile court's second adjudica-
tion of Caitlyn's CINA status and placement of the girls in
foster care was not appealed by Ms. S. There is no contention
by Ms. S. that the juvenile court erroneously granted the
Department's requests for shelter care on February 8, 2011,
or on January 10 and 11, 2012.[20] Accordingly, the period of

---

S. would also have a right to pursue any challenge she made to the later
plan for reunification of Caitlyn with Mr. M.

**19.** The calculation of this time begins from 30 days after the girls
actually entered out-of-home placement. *See* note 14.

**20.** Ms. S. presumes that, because the juvenile court's ultimate place-
ment of the girls in long-term foster care was reversed, the initial
placement in foster care as emergency shelter care was erroneous as
well. But the decision to place a child in emergency foster care is
distinct from the ultimate determination that the child is a CINA and
that out-of-home placement is the appropriate disposition. *See* CJ § 3–
815. In any event, the Court of Special Appeals did not hold that the
juvenile court was unjustified in granting emergency shelter care when
it reversed Caitlyn's original CINA order and the CINA disposition of
foster care placement for both girls. Thus, even if there is otherwise
merit to Ms. S.'s arguments, it does not necessarily follow that the
juvenile court should have discounted the time during which the girls
were in emergency shelter care.

time in which the girls were in foster care under the order that was reversed lasted from May 18, 2011, to January 5, 2012—seven months and 19 days.

Therefore, the juvenile court's findings as related to 10 months of foster care—the time between February and May 2011 and between January and July 2012—are not at issue. Regardless, Ms. S. is correct in that, at the time of the July 2012 permanency plan hearing, the children had only been in foster care under an order with a sufficient basis for the previous consecutive five months.[21] She argues that, given that relatively short period, the court should have allowed her additional time to comply with court orders and to address the court's safety concerns before changing the permanency plan to adoption.

The juvenile court acknowledged that "technically" and "legally" the children were not 16 months removed from their mother. However, the court expressed concern that:

treating it that way is a huge disservice to these children. For these children, they've been in care for 16 months. Whatever the legal complications were that required further proceedings, that can't be held to the detriment of the children[.]

Ms. S. rejects the characterization of the time in which her children were erroneously taken from her care as a "technicality" or "legal complication." Rather, she argues, the events of that time should have been given far less weight in the juvenile court's analysis of the statutory factors for setting a permanency plan, including the children's attachment and emotional ties to their mother; the length of time the children have resided with the current foster parent and the resulting emotional attachment to that parent; and the potential harm to the children as a result of remaining in State custody for an excessive period of time.

---

21. Six months and 16 days passed between January 10 and July 26, 2012. However, as stated above, *see* note 14, the court is to consider the children to have been in out-of-home placement 30 days from the date they are actually placed out of the home. CJ § 3–823(b)(2).

*Attachment to the Natural Mother*

██ In adopting a permanency plan, the juvenile court was to consider the girls' attachment and emotional ties to their natural mother. CJ § 3–823(e)(2); FL § 5–525(f)(1)(ii).

Ms. S. complains that the juvenile court incorrectly considered the weak bond the children had with their mother, as that was, she contends, the outcome of the out-of-home placement. Had the girls remained in her custody, she argues, the bond between them would have been stronger, which would have favored a permanency plan of reunification with her. This assertion, however, is conjecture, as it is entirely possible (and perhaps likely, given the record to date) that her continued custody of the girls could have had detrimental effects on their relationship. For example, at the time the girls were placed in foster care, Ms. S. had left them alone without appropriate supervision, refused to provide them with needed counseling, engaged in excessive physical discipline, moved them back and forth between home and hotels, and taken Ashley out of school for long periods of time. Ashley was plainly unhappy while in her mother's care. The Court of Special Appeals found that these circumstances were not sufficient to remove the girls from their mother's custody in May 2011 but, given Ms. S.'s subsequent refusal to correct any of the juvenile court's safety concerns, it appears unlikely that the children's bond with their mother would have improved, had they remained in her care. At the very least, any contention as to how the bond between Ms. S. and her children would have been affected by their remaining in her custody is simply speculative.

Even assuming, however, that losing custody of her children lessened the emotional attachment between them, that diminishing bond appears due largely to Ms. S.'s own actions. For example, she was apparently unwilling or unable to arrive on time at visits or other important events in the children's lives; at one point, she missed eight weeks of visits without informing the Department or her children that she was not able to be present, such that the visitation facility eventually canceled

her regular visitation time. Despite Ms. S.'s various representations on the subject, she failed to make arrangements for the girls' medical and mental health care. Ms. S.'s unpredictability disappointed the girls and made them anxious, causing them to gradually lose interest in her visits altogether.

The record indicates that, especially during later visits, Ms. S. was distracted and often did not interact with the children. It is evident that she bore significant responsibility for her deteriorating relationship with the girls, making insulting comments to Ashley about her appearance, refusing to return Ashley's belongings to her, and making promises to Caitlyn that she did not fulfill. By the time of the July 2012 hearing, neither child wished to continue visitation with their mother at all.

In sum, the record demonstrates that the weakened bond between Ms. S. and her children was not attributable to her loss of custody as much as to her unreliable and unsupportive behavior and inability to fulfill basic parental commitments. While the children were in foster care, Ms. S. had more than a sufficient opportunity to maintain strong emotional ties to her children, but she did not use that time to cultivate a healthy bond with the girls. Instead, as the juvenile court found, her actions made clear that visitation with the children and their physical and mental well-being was not a priority for her.

*Time Spent with and Attachment to Foster Parent*

The juvenile court was obliged to weigh the length of time that the girls had spent with Ms. W and the emotional attachment they had to her—two of six statutory factors to be considered in selecting a permanency plan that is in the child's best interest. CJ § 3–823(e)(2); FL § 5–525(f)(1)(iii) & (iv). Ms. S. argues that the juvenile court's analysis should not have assessed the full time spent by the girls in Ms. W.'s care and should not have concluded that there was a strong bond between the girls and their foster mother, as that attachment was attributable to the out-of-home placement, at least part of which took place under an order later reversed. But she does not explain how, in considering "the child's attachment and

emotional ties to the child's current caregiver and caregiver's family," the juvenile court is to ignore the existing attachment and emotional ties and, instead, imagine what those ties might have been in an alternate world in which the children had spent one-third less time with the caregiver than they actually did. The juvenile court is not required to engage in such mental gymnastics. Rather, the court is to assess the reality of the children's circumstances and make findings accordingly.

Of course, the bond between a foster caregiver and a child is not the determinative factor in a permanency plan. This Court has previously held that the emotional attachment between children and their foster care providers cannot, by itself, justify a change in permanency plan away from reunification. *In re Yve S.*, 373 Md. at 594, 819 A.2d 1030 ("[T]he fact that the child may be 'doing very well,' or may have made progress in the environment of foster care, or even 'blossomed there' " could not, by itself, support a change in permanency plan from reunification because those considerations are "largely not telling on the main issue.")(internal citations removed). Where the initial placement of the children outside of the home has been held erroneous by appellate decision, consideration of the children's time and improvement in foster care will normally be of diminished value. In this case, however, there was an abundance of other persuasive evidence supporting the juvenile court's decision, and there is no indication that these factors were given overriding weight in the overall analysis of the permanency plan change.

*Time Spent in Department's Custody*

One of the primary considerations in setting a permanency plan for children who have been adjudicated CINA is to avoid the harmful effects when children languish in temporary living situations. *In re: Adoption/Guardianship No. 10941*, 335 Md. 99, 104, 642 A.2d 201 (1994) (one of the "important purposes" of the federal law that led to the requirement of permanency plans in the CINA statute was "to eliminate 'foster care drift' "). An important premise of the

CINA statute is that "it is in a child's best interest to spend as little time as possible in foster care." *Id.* at 106, 642 A.2d 201.

While Ms. S. acknowledges that the children's 16 months in foster care might suggest foster care drift, she asserts that the months of foster care between the January 2012 hearings and the July 2012 change in the permanency plans by themselves do not. Nonetheless, the many months spent by the children in foster care—and, more importantly, the harmful effects of that extended uncertainty—do not disappear the moment an appellate court reverses an initial decision to place them in foster care. A key purpose of the CINA law is to "achieve a timely, permanent placement for the child consistent with the child's best interests[.]" CJ § 3–802(a)(7). It would not have been in either child's best interests to consider the time the child had spent in foster care placement as a mathematical exercise rather than evaluate the detrimental impact a prolonged custodial limbo was having on their mental and emotional well-being. The juvenile court acted properly in acknowledging the full extent of the girls' stay in foster care and concluding that the certainty of permanent placement was required to remedy the harm flowing from that lengthy commitment.

### Unfairness

Ultimately, Ms. S.'s argument boils down to a contention that "it is patently unfair to weigh the passage of time against" her. It is difficult not to have some sympathy for this complaint. But the task of the juvenile court is not to remedy unfairness to the mother, but to weigh any unfairness in light of the best interests of her children. *In re Yve S.*, 373 Md. at 569, 819 A.2d 1030. In the process of setting a permanency plan, the best interests of the child are to prevail. CJ § 3–823(e)(1)(i) (setting forth a priority of potential permanency plans for juvenile court to consider "to the extent consistent with the bests interests of the child"); FL §§ 5– 502(b) ("It is the policy of this State . . . (2) to resolve doubts in favor of the child when there is a conflict between the interests of a minor child and the interests of an adult."), FL

§ 5–525(f)(2)(directing a local department of social services to consider a hierarchy of permanency plan options "to the extent consistent with the best interests of the child").

Any unfairness to the parent is minimized by the presumption that reunification with the parent is normally in the child's best interests and by the opportunities available to a parent during a period without custody to address the court's concerns and take steps toward reestablishing healthy bonds with his or her children. Indeed, in this case, the juvenile court explicitly recognized that presumption and looked for evidence that the mother had begun making needed improvements. The court stated:

[I]f I had seen even a glimmer of hope that she was making progress, cooperating with the Department, making efforts to do the things that she's been ordered to do repeatedly, I might give her an additional chance. Not because of technicalities but because of the reality that if we could be working toward reunification, we should be.

The court did not rely solely on abstract calculations of time that the girls spent out of their mother's home, wherever that might have been, but properly focused on the extent of Ms. S.'s efforts to provide proper care for her children.

The juvenile court's directions to Ms. S. were consistent with the purpose of the CINA law to "hold parents of children found to be in need of assistance responsible for remedying the circumstance that required the court's intervention[.]" CJ § 3–802(a)(4). Ms. S. did not address those circumstances in any meaningful way. As such, regardless of the number of months in which the girls were in foster care, Ms. S. has not been treated unfairly when, despite the juvenile court's efforts to steer the plan toward an ultimate goal of reunification, she failed to do the any of the basic tasks she needed to prepare for the return of her children.

 In sum, in selecting a permanency plan for a child in need of assistance, a juvenile court may consider information relating to the entire period of the child's placement even when an appellate decision has reversed an earlier order that

was the basis for a portion of the time spent in that placement. To do otherwise would artificially distort the court's evaluation of the best interests of the child, which is the determinative factor in choosing a permanency plan. Accordingly, the juvenile court, in this case, did not err in considering the events occurring during the entire 16 months that Ashley and Caitlyn spent in foster care when it reviewed their permanency plan in July 2012.

### Whether the Juvenile Court Abused its Discretion in Ordering a Permanency Plan of Adoption

Ms. S. argues that the juvenile court's decision to change the girls' permanency plan from reunification to adoption was an abuse of discretion, particularly given the "strong presumption that the child's best interests are served by maintaining parental rights." *In re Yve S.*, 373 Md. at 571, 819 A.2d 1030. She condenses the court's determination to three essential findings: (1) the children were doing well in foster care; (2) the mother failed to comply with numerous court orders; and (3) the mother was not truthful with either the Department or the court, possibly because of mental health issues. None of these conclusions, she says, are sufficient to deprive her of her constitutionally protected parental rights.

As discussed above, the children's improvement in foster care is not, by itself, sufficient to support a change in permanency plan away from reunification with a parent. As for her failure to comply with court orders, Ms. S. contends that she should have been granted more time to fulfill the tasks required of her. She cites various cases in which parents were given long periods of time to work toward reunification,[22]

---

22. *See In re Shirley B.*, 419 Md. 1, 6, 18 A.3d 40 (2011) (despite physical and sexual abuse and extreme neglect, permanency plan was reunification for 28 months before being changed to adoption); *In re Ashley E.*, 387 Md. 260, 874 A.2d 998 (2005) (despite physical and sexual abuse and the mother's failure to regularly visit the children in foster care, permanency plan was reunification for 17 months before being changed to adoption); *In re Samone H.*, 385 Md. 282, 869 A.2d 370 (2005)

and argues that she deserves similar amounts of time for the girls to remain under a reunification plan.

■ Lastly, Ms. S. argues that her untruthfulness or mental illness were not valid reasons to abandon the plan of reunification. "The fact that [a parent] has a mental or emotional problem and is less than a perfect parent . . . is not a legitimate reason to remove [children] from a natural parent competent to care for them in favor of a stranger." *In re Yve S.*, 373 Md. at 593–94, 819 A.2d 1030 (internal citation removed). Nor is mental illness coupled with homelessness, without any other indicators of harm, sufficient justification for taking away parental rights. *See In re Adoption/Guardianship of Rashawn H.*, 402 Md. 477, 499, 937 A.2d 177 (2007). Therefore, Ms. S. concludes, none of the juvenile court's bases for altering the permanency plan from reunification to adoption were valid reasons for the change.

Our review of these contentions is limited. Because the overarching consideration in approving a permanency plan is the best interests of the child, we examine the juvenile court's decision to see whether its determination of the child's best interests was "beyond the fringe" of what is "minimally acceptable." *In re Yve S.*, 373 Md. at 583–84, 819 A.2d 1030. Even if one ignores the juvenile court's findings as to the children's bonds and time spent with their foster mother—which is nonetheless properly taken into account under FL § 5–525(f)(1)(iii) and (iv)—the evidence before the juvenile court in reaching its decision was more than sufficient to support the court's decision that it was not in the girls' best interests to return to Ms. S.'s care. We briefly summarize the pertinent facts as to the FL § 5–525(f)(1) statutory factors that supported the juvenile court's conclusion.

*Safety and Health in the Mother's Home*

■ The juvenile court was required to consider the girls' "ability to be safe and healthy in the home" of their mother.

---

(despite serious neglect and noncompliance with court orders, permanency plan was reunification for approximately two years).

FL § 5–525(f)(1)(i). The court found that Ms. S. had not prepared a suitable home for the girls' anticipated return, and may not have had any home at all for the girls. While, as noted above, homelessness is not, by itself, sufficient justification for taking away parental rights, it is also true that:

The State is not required to allow children to live permanently on the streets or in temporary shelters, to fend for themselves, to go regularly without proper nourishment, or to grow up in permanent chaos and instability, bouncing from one foster home to another until they reach eighteen and are pushed out onto the streets as adults, because their parents, even with reasonable assistance from DSS, continue to exhibit an inability or unwillingness to provide minimally acceptable shelter, sustenance, and support for them. Based upon evidence of the effect that such circumstances have on a child, a court could reasonably find that the child's safety and health ... is jeopardized.

*In re Adoption/Guardianship of Rashawn H.*, 402 Md. at 501, 937 A.2d 177.

A key consideration is thus whether the parent exhibits an ability or willingness to "provide minimally acceptable shelter, sustenance, and support." Often, this good faith effort will be shown in a parent's utilization of social services to seek and secure a safe and healthy home environment. Here, however, Ms. S. refused attempts to assist her in providing a minimally acceptable level of care for her children—she would not even divulge the circumstances of her living situation, much less work with the Department to improve them. The juvenile court explicitly took note of this fact in its analysis of this factor:

I don't think they can be safe and healthy if there is no home and if Ms. S. is not asking for help, which she is not. She has gone out of her way to [not] ask for help from the Department on the housing issue.

Given Ms. S.'s resistance to receiving help in creating a healthy and safe home environment for her children, the

juvenile court properly found that the girls would not be safe and healthy in her home, wherever that may be.

*Attachment and Emotional Ties to Ms. S.*

FL § 5–525(f)(1)(ii) required the juvenile court to consider the children's attachment and emotional ties to their mother. The emotional ties between Ms. S. and the girls were weakened substantially by Ms. S.'s failure to arrive at visitation appointments on time—if she arrived at all—and her failure to engage with them during those visits. Ms. S. did not make serious efforts to provide them with needed medical and mental health care, and refused to allow them to have their belongings until the girls were returned to her care.

The attachment and emotional ties that did exist appeared to be unhealthy, as the evidence indicated that Ashley had been "parentified" and the uncertainty regarding Ms. S.'s visits caused Caitlyn anxiety. Ultimately, by the time of the July 2012 proceedings, the children no longer wished to visit with their mother.

*Harm if Removed from Current Placement*

FL § 5–525(f)(1)(v) required the juvenile court to consider any potential harm to the children's emotional, developmental, and educational needs that could result from their removal from foster care. The record is replete with instances of Ms. S.'s opposition to her children being supplied services for these needs. Although Ashley was significantly behind in school, Ms. S. resisted the school's efforts to provide special education accommodations, and took Ashley out of school for lengthy periods without informing school officials. Ms. S. did not attend her daughter's individualized education plan meetings, even when ordered by the court to do so. She did not enroll Ashley in a program recommended by the school to deal with Ashley's disciplinary problems, or provide proof that she had enrolled Ashley in the alternative program that Ms. S. preferred. Ms. S. did not allow Ashley to meet with her school counselor, nor did she secure needed therapy for Ashley. She denied Ashley needed orthodontic care and did not seek treatment for Caitlyn's hearing problems. The record

also shows that, when finally undertaken by the school, the Department, or Ms. W., these actions had beneficial results for the children.[23] The juvenile court's concern that the girls would suffer emotional, developmental, and educational harm by returning to their mother's care appears justified.

*Excessive Time in State Custody*

 The children had been in the custody of the Department since February 2011. As discussed above, that fact is not altered merely because, for part of that time, the girls placement out of the home was a result of an order that was later reversed. "A child's life does not go on hold just because an appeal is pending, and the juvenile court will continue to make decisions consistent with the child's best interests." *In re Joseph N.*, 407 Md. 278, 305, 965 A.2d 59 (2009). As explained above, an important goal of the CINA law is to limit the time children spend in foster care because of the detrimental effects on their well-being. *In re Cadence B.*, 417 Md. 146, 164, 9 A.3d 14 (2010).

The evidence showed that the ongoing uncertainty for the children of their permanent living situation was harmful to them. As we have concluded, the court properly accounted for all of the time that the children were in State custody in evaluating the extent of that ongoing harm. While parents in other cases may have received somewhat longer periods of time to work toward reunification, that determination is dependent on the individual parent's willingness and efforts to improve their circumstances, such that the prospects for a safe and healthy home appear plausible. Here, Ms. S. showed no progress in addressing the court's safety concerns, and the court expressed its disappointment at the dim outlook that she would do so in the near future.

*Summary*

Ms. S. attacks three bases of the court's decision independently, asserting that each alone is insufficient for the change

---

**23.** For example, after being placed on an individualized education plan, Ashley made the honor roll, and had no further disciplinary problems at school after receiving counseling.

in permanency plan. In doing so, she characterizes her refusal to abide by court orders as one generic consideration, rather than focusing on what those court orders actually were and the negative results and inferences to be drawn from her failure to comply with them. The problem is not that Ms. S. was merely uncooperative with the juvenile court, but that she failed to fulfill basic parental duties to her children, even when ordered to do so. Moreover, the juvenile court's task in approving a permanency plan was not to evaluate each of its findings in a vacuum, but to take all relevant facts into account in its consideration of the children's best interests. We cannot conclude that it abused its discretion in July 2012 in deciding that adoption was in the best interests of Ashley and Caitlyn.

## Conclusion

The law governing CINA proceedings, which allows for concurrent juvenile court and appellate proceedings, can generate difficult questions regarding timely determinations of a parent's rights with respect to a child and the proper placement of a child while those determinations are reviewed. When a parent has been deprived of custody of a child for a period of time as a result of an order that has been reversed, it is arguably more fair to the parent to disregard—or significantly discount consideration of—information related to that period in subsequent proceedings. But the best interests of the child do not permit the juvenile court to ignore the reality of a child's life. In balancing fairness to the parent and fulfilling the needs of the child, the child prevails. Therefore, in selecting the appropriate permanency plan for children in need of assistance, the juvenile court must, in accordance with the statutory factors, evaluate the parent's actual history of conduct and behavior and the actual circumstances of the child's life. In this case, the juvenile court did not err in doing so. Nor can we say that its decision to approve a permanency plan of adoption was an abuse of discretion.

JUDGMENT OF THE CIRCUIT COURT FOR MONTGOMERY COUNTY AFFIRMED. COSTS TO BE PAID BY APPELLANT.

BELL, C.J., ADKINS and BARBERA, JJ., Concur.

Concurring opinion by BELL, C.J.

We granted certiorari in this case to consider the following: "(1) Where the Appellate Court held the removal of children from their mother's care to have been an abuse of judicial discretion, may the juvenile court in a subsequent hearing consider those months that the children spent in foster care as being an "out-of-home placement" for the purposes of determining the permanency plan for the children, pursuant to Md.Code Ann., CJP § 3–823? [1]

"(2) Did the juvenile court err in ordering a plan of adoption for the children, where they were aged 13 and 4½ years and had a bond with their mother?"

We hold that it is permissible, in determining an appropriate permanency plan, for a juvenile court to consider information relating to the time spent in foster care by a child in need of assistance, even when the juvenile court order that was the basis of that foster placement has been reversed by an appellate court. *In re: Ashley S. and Caitlyn S.*, 431 Md. 678, 713–

---

1. Maryland Code (1974, 2006 Repl.Vol., 2011 Supp.) § 3–823(e)(2) of the Courts and Judicial Proceedings Article ("CJ") provides that "[i]n determining the child's permanency plan, the court shall consider the factors specified in § 5–525(f)(1) of the Family Law Article." Maryland Code (1984, 2006 Repl.Vol., 2011 Supp.) § 5–525(f)(1) of the Family Law Article ("FL"), which addresses the factors to be considered in a juvenile court's development of a permanency plan, states:

 "(1) In developing a permanency plan for a child in an out-of-home placement, the local department shall give primary consideration to the best interests of the child, including consideration of both in-State and out-of-state placements. The local department shall consider the following factors in determining the permanency plan that is in the best interests of the child:
 "(i) the child's ability to be safe and healthy in the home of the child's parent;
 "(ii) the child's attachment and emotional ties to the child's natural parents and siblings;
 "(iii) the child's emotional attachment to the child's current caregiver and the caregiver's family;
 "(iv) the length of time the child has resided with the current caregiver;
 "(v) the potential emotional, developmental, and educational harm to the child if moved from the child's current placement; and
 "(vi) the potential harm to the child by remaining in State custody for an excessive period of time."

14, 66 A.3d 1022, 1042–43, 2013 WL 2350483 (2013). In this regard, we acknowledge that "[w]hen a parent has been deprived of custody of a child for a period of time as a result of an order that has been reversed, it is arguably more fair to the parent to disregard—or significantly discount consideration of—information related to that period in subsequent proceedings." *Id.*, 431 Md. at 719, 66 A.3d at 1046. We conclude, however, that "the best interests of the child do not permit the juvenile court to ignore the reality of a child's life," and thus, that "[i]n selecting the appropriate permanency plan for children in need of assistance, the juvenile court must, in accordance with the statutory factors, evaluate the parent's actual history of conduct and behavior and the actual circumstances of the child's life," including those circumstances relating to the period of time the child spent in foster care. *Id.*, 431 Md. at 719, 66 A.3d at 1046. We also hold that the juvenile court, in this case, did not abuse its discretion in determining that adoption was the appropriate plan for the children in question. *Id.*, 431 Md. at 719, 66 A.3d at 1046.

I agree with the Court's reasoning in this case, as well as the result reached, and therefore join in the judgment. I write separately, however, to caution juvenile courts, in determining an appropriate permanency plan for a CINA, against allowing information relating to the time that the CINA has spent in an out-of-home placement, pursuant to an order that has been reversed on appeal, to play a dispositive role in its inquiry. Should a juvenile court be able to justify adherence to its original decision on the basis of facts that arose out of that very decision, and which cast the parent in question in a negative light, regardless of an appellate court's conclusion that the decision was legally improper, the parent's right to appeal that decision would effectively be rendered nugatory.

It is true that Maryland Code (1974, 2006 Repl.Vol., 2011 Supp.) § 3–823(e)(2) of the Courts and Judicial Proceedings Article ("CJ"), and Maryland Code (1984, 2006 Repl.Vol., 2011 Supp.) § 5–525(f)(1)(iii)–(vi) of the Family Law Article ("FL"), allow a juvenile court, in developing a permanency plan, to consider information relating to the length of time a child has

spent in an out-of-home placement. This Court has often acknowledged, however, that this information cannot be the primary basis for a change in permanency plan from reunification to adoption. *See In re: Adoption/Guardianship of Alonza D., Jr.*, 412 Md. 442, 464, 987 A.2d 536, 549 (2010); *In re: Yve S.*, 373 Md. 551, 594, 819 A.2d 1030, 1055 (2003) (quoting *In re: Barry E.*, 107 Md.App. 206, 220, 667 A.2d 931, 938 (1995)). *See also In re: James G.*, 178 Md.App. 543, 603–605, 943 A.2d 53, 87–89 (2008). We have additionally cautioned juvenile courts against taking actions which would defeat the right of a parent to pursue his or her appeal with effect. *In re: Emileigh F.*, 355 Md. 198, 204, 733 A.2d 1103, 1105 (1999). Acknowledging these limits, we nonetheless hold as we do, only because we are satisfied that "there was an abundance of other persuasive evidence supporting the juvenile court's decision, and there is no indication that [the factors relating to the children's time in foster care] were given overriding weight in the overall analysis of the permanency plan change." *In re: Ashley S. and Caitlyn S.*, 431 Md. 678, 711, 66 A.3d 1022, 1041, 2013 WL 2350483 (2013). In the absence of such other factors, however, the effect of allowing a juvenile court to deprive a parent of reunification with their child based on the outcome of an initial identical order which has been declared improper, upon appellate review, pursuant to appeal by the very same parent, completely undermines that parent's appeal rights.

It is thus impermissible to rely solely, or even primarily, on the length of time a child has spent in an out-of-home placement, or factors relating to that period, as the basis for changing a permanency plan from reunification to adoption.

Concurring Opinion by ADKINS, J., which BARBERA, J., joins.

I agree with the outcome of this case. I even agree with most of the Majority's reasoning. I write separately because on page 35 of the Slip Opinion the Majority makes a statement that I think it will later regret.

Specifically, the Majority writes: "Where the initial placement of the children outside of the home has been held erroneous by appellate decision, consideration of the children's time and improvement in foster care will normally be of diminished value." Maj. Op. at 711, 66 A.3d at 1041. This "diminished value" language contradicts the holding of this case, under which, any attempt to discount the child's time or improvement in foster care "would artificially distort the court's evaluation of the best interests of the child, which is the determinative factor in choosing a permanency plan." *Id.* at 714, 66 A.3d at 1043.

Under the Majority's holding, "in selecting a permanency plan for a child in need of assistance," juvenile courts "may consider information relating to the entire period of the child's placement even when an appellate decision has reversed an earlier order that was the basis for a portion of the time spent in that placement." *Id.* In doing so, courts are not "to ignore the existing attachment and emotional ties [or] imagine what those ties might have been in an alternate world in which the children had spent one-third less time with the caregiver than they actually did." *Id.* at 711, 66 A.3d at 1041. Any attempt to figure out what would have been if the juvenile court had not issued an erroneous decision the Majority calls "mental gymnastics," which it prohibits. *Id.* at 711, 66 A.3d at 1041. Rather, it requires juvenile courts "to assess the reality of the children's circumstances and make findings accordingly." *Id.*

Yet, in the same breath, the Majority speaks of "normally" giving "consideration of the children's time and improvement in foster care ... diminished value." *Id.* The Majority does not pause to explain what it has in mind when it says "normally," how diminished this value must be, or how a juvenile court is to calculate it, without engaging in the impossible "mental gymnastics" criticized one page earlier.

This "diminished value" statement does not only undermine the entire opinion; it also creates uncertainty for future cases, in which parents, whose children were erroneously found CINA, placed in foster care, or subjected to a particular permanency plan, will undoubtedly rely on the statement to

argue that their children's "time and improvement in foster care [be given] diminished value," whatever that value may be. I do not think that is the result the Majority was looking for in holding that "the best interests of the child do not permit the juvenile court to ignore the reality of a child's life." *Id.* at 719, 66 A.3d at 1046.

For these reasons, I concur in the result only.

Judge BARBERA has authorized me to state that she joins in this concurring opinion.