*In Re: R.S.,* No. 58, September Term, 2019.  Opinion by Hotten, J.

**STATUTORY INTERPRETATION– INTERSTATE COMPACT ON THE PLACEMENT OF CHILDREN– CINA PROCEEDINGS**

The Court of Appeals held that the Interstate Compact on the Placement of Children did not apply to out-of-state placements of children with their non-custodial, biological parent. The plain language of the Compact makes clear that it only applies to placements in foster and pre-adoptive care, neither of which contemplates parental placements.  Accordingly, the Court of Appeals affirmed the judgment of the Court of Special Appeals.

IN THE COURT OF APPEALS

OF MARYLAND

No. 58

September Term, 2019

_____

IN RE: R.S.

_____

Barbera, C.J.,
McDonald,
Watts,
Hotten,
Getty,
Booth,
Biran,

JJ.

_____

Opinion by Hotten, J.

_____

Filed: August 17, 2020

Pursuant to Maryland Uniform Electronic Legal Materials Act
(§§ 10-1601 et seq. of the State Government Article) this document
is authentic.



Suzanne C. Johnson, Clerk

In February 2018, the Circuit Court for Worcester County, sitting as a juvenile court, found, after a hearing, that R.S.[1] was a child in need of assistance ("CINA").[2] The juvenile court awarded joint custody of R.S. to the non-custodial, biological father and paternal grandparents, based on the determination that the Interstate Compact for the Placement of Children ("ICPC")[3] applied to the placement of the child in the care of her biological father. R.S. noted an appeal to the Court of Special Appeals, which vacated and remanded to the juvenile court, holding that the plain language of the ICPC, codified in Md. Code, Fam. Law Art. ("Fam. Law") §§ 5-601–5-611, does not apply to out-of-state placements of a child in the care of a biological, non-custodial parent. Subsequently, the Worcester County Department of Social Services filed a petition for writ of *certiorari* on October 10, 2019.

---

[1] Out of respect for the privacy interests of the parties, we shall refer to them by their initials throughout this opinion.

[2] CINA refers to "[c]hild in need of assistance[.]" Md. Code, Courts & Judicial Proceedings Article ("Cts. & Jud. Proc.") § 3-801(g). Cts. & Jud. Proc. § 3-801(f) provides:

> (f) "Child in need of assistance" means a child who requires court intervention because:

> (1) The child has been abused, has been neglected, has a developmental disability, or has a mental disorder; and

> (2) The child's parents, guardian, or custodian are unable or unwilling to give proper care and attention to the child and the child's needs.

[3] Fam. Law §§ 5-601–5-611; ICPC, art. III. The text of the ICPC is available at https://aphsa.org/AAICPC/AAICPC/text_icpc.aspx (last visited July 27, 2020), archived at https://perma.cc/847J-9QQT.

We granted the petition to address the following questions, which we have slightly rephrased:

1. Did the Court of Special Appeals err in its interpretation of the Interstate Compact on the Placement of Children, Md. Code (2019 Repl. Vol.) § 5-601 – 5-611 of the Family Law Article ("ICPC"), by invalidating Maryland Code of Regulations ("COMAR") 07.02.11.28 and holding that the ICPC does not apply to out-of-state, non-custodial parents?

2. Did the Court of Special Appeals err in reversing both the juvenile court's order that R.S. was a CINA and the award of joint custody of R.S. to her father and paternal grandparents, based on the holding that the juvenile court should not have ordered an investigation under the ICPC of a non-custodial father?

For reasons explained *infra*, we answer both questions in the negative and affirm the judgment of the Court of Special Appeals.

## FACTUAL AND PROCEDURAL BACKGROUND[4]

### *June 2016-November 2016:  Allegations of Neglect and Shelter Care*

In June 2016, the Worcester County Department of Children and Family Services ("the Department") learned that S.S. may have neglected her nineteen-month-old daughter, R.S., and that both were living in her minivan.[5]  Upon locating S.S. and R.S., the

---

[4]  The facts underlying this appeal are derived from the juvenile court proceedings.

[5] As derived from the Department's report, in October 2015, S.S. and her daughter came to the attention of the Department when it was reported that they were living in a hotel with a male relative who was accused of, and later admitted to, molesting another child.  That investigation was closed because S.S. refused services.  According to the allegations contained in the CINA petition, the Maryland State Police received a report in 2016 of a family living out of a broken-down minivan in a store parking lot.  Upon approaching the vehicle, a social worker from the Department observed that R.S. and S.S. were in fact living in the poorly maintained vehicle.  The Department also learned that S.S. was unemployed and slept in her vehicle when she could not afford a hotel room.  The

(continued . . . )

2

Department observed that the interior of the van was covered with trash, smelled of spoiled food, and contained black trash bags filled with dirty laundry. S.S. and R.S. had been living in the van for a month before the Department became aware of the situation. The Department subsequently arranged long-term shelter care for S.S. and R.S., but S.S. left the shelter with R.S. and continued living in her vehicle. The allegations of neglect persisted until November 4, 2016, when the Department removed R.S. from the care of S.S. and placed her in emergency foster care with foster parents ("the foster parents"). Soon thereafter, the Department filed a Petition for Continued Shelter Care and a Petition for Child in Need of Assistance in the Circuit Court for Worcester County, sitting as a juvenile court ("the juvenile court").[6] On November 10, 2016, the juvenile court held a hearing, and thereafter, ordered that R.S. remain in foster care, pending an adjudicatory hearing on the CINA petition. The Department advised the juvenile court that S.S. had informed the Department that R.S.'s biological father, T.S., resided in Delaware. The Department contacted T.S. by phone and apprised him of the upcoming adjudicatory hearing scheduled for December 2016.

---

(. . . continued)
Department reported that R.S. appeared "red, sweaty, and dirty." For reasons that will become apparent, the specific allegations of neglect against S.S. are not relevant to the issues we resolve herein.

[6] The docket sheets and filing stamps indicate that the Emergency Shelter Care Petition was filed on November 7, 2016. The Continued Shelter Care Petition was filed prior to the CINA petition. Typically, the CINA petition is filed before the Shelter Care petition. *See* Cts. & Jud. Proc. § 3-815(a) ("In accordance with regulations adopted by the Department of Human Services, a local department may authorize shelter care for a child who may be in need of assistance and has been taken into custody under this subtitle.").

*December 2016: Adjudicatory Hearing and Beginning of Disposition Hearing*[7]

T.S. appeared *pro se*[8] at the adjudicatory hearing before the juvenile court on December 2, 2016.[9] T.S. advised the juvenile court that he suffered from memory loss and learning disabilities, as the result of a previous traumatic brain injury. T.S. requested, and the juvenile court permitted, the assistance of his father during the hearing. T.S. indicated that he recently became aware that R.S. might be his daughter and agreed to submit to a court-ordered paternity test.

During the proceedings, the allegations of neglect were focused on S.S., so the juvenile court proceeded with the adjudicatory hearing before establishing paternity, prior to the final disposition hearing. At the conclusion of the adjudicatory hearing, the juvenile

---

[7] "After a CINA petition is filed [], the court shall hold an adjudicatory hearing[,]" during which, "[t]he allegations in [the] petition [] shall be proved by a preponderance of the evidence." Cts. & Jud. Proc. Art. § 3-817(a) and (c). Unless the petition is dismissed, "the court shall hold a separate disposition hearing after an adjudicatory hearing to determine whether the child is a CINA." Cts. & Jud. Proc. § 3-819(a)(1). The disposition hearing must occur on the same day as the adjudicatory hearing, unless "on its own motion or motion of a party, the court finds that there is good cause to delay the disposition hearing to a later day." Cts. & Jud. Proc. § 3-819(a)(2).

[8] T.S. was named in the petition, but there was a disagreement regarding whether T.S. should have been considered a party at this juncture because he was not named on the birth certificate, and paternity had not been established.

[9] Some of the proceedings in the juvenile court were conducted before a juvenile magistrate. Cts. & Jud. Proc. § 3-807(b)(1) and (2) provide:

(b)(1) A magistrate appointed for juvenile causes may conduct hearings.

(2) Each proceeding shall be recorded, and the magistrate shall make findings of fact, conclusions of law, and recommendations as to an appropriate order.

court sustained the allegations contained in the CINA petition and proceeded with the disposition hearing. The juvenile court considered testimony from a Worcester County child protective services employee, who testified that it would be helpful to conclusively establish T.S.'s paternity before continuing with the disposition hearing.

Counsel for R.S.[10] requested supervised visitation with T.S. and his parents, if paternity was established, but the request was denied. Finding good cause for a continuance, the juvenile court, with the agreement of the parties, continued the disposition hearing pending the results of the paternity test, because "if, in fact, [T.S.] is determined to be the father of R.[S.] then of course he is a party of the case and has all of the rights and responsibilities . . . that a biological parent has[.]"

### *January-June 2017: Continued Disposition Hearings and Visitation*

The juvenile court resumed the disposition hearing on January 9, 2017. Based on the outcome of the paternity test, the juvenile court determined that T.S. was the biological father of R.S. T.S. requested a postponement to demonstrate parental fitness.[11] In the interim, the juvenile court ordered that the Department facilitate supervised visits for T.S.[12] and provide parenting classes and other services, including mental health and substance abuse evaluations. The juvenile court also ordered that the Department transition T.S. to

---

[10] R.S. had counsel to represent her interests during the juvenile court proceedings.

[11] This information was taken from the courtroom minutes. Counsel for R.S. "does not recall father making such a request of the [juvenile] court."

[12] S.S. was also allowed separate supervised visits with R.S., but her attendance at the visits was limited.

5

unsupervised visitation, if parental fitness was demonstrated, and arrange a home study of the paternal grandparents' home in Delaware.[13]

On January 30, 2017, T.S. and the paternal grandparents attended a family involvement meeting regarding R.S.'s continued placement in foster care. The Department alleged that T.S. and his parents agreed to undergo an ICPC home study, so that they could be considered as a viable placement option for R.S. Counsel for R.S. was not present due to a scheduling conflict.

T.S. successfully completed the required substance abuse and mental health evaluations. The Department arranged supervised visits between T.S. and R.S. The Department reported that T.S. had not missed any of his weekly visits with R.S. and was amenable to accepting support and guidance from the Department and other family members in developing a relationship with his daughter. The Department further reported that T.S. had maintained stable employment and housing, as required by the agreement between the Department and T.S.

On March 13, 2017, the disposition hearing resumed. Counsel for R.S. expressed concern regarding R.S.'s continued placement in foster care, asserting that the Department

---

[13] The court reporter was unable to produce a transcript for the January 9 hearing because there was no audio recording. As the Court of Special Appeals noted, the courtroom minutes and findings of fact do not explicitly reference the ICPC. However, counsel for R.S. filed a research memorandum the following day, arguing that the ICPC did not apply to out-of-state placements with non-custodial biological parents. The corresponding order also indicated that a "home[]study on paternal grandparents [was] to be initiated." The brief filed by R.S. indicates that the Department raised the ICPC at the hearing.

6

had not encouraged the development of a parent-child relationship between T.S. and R.S. Counsel for R.S. also argued that R.S. was not a CINA, because the allegations of neglect were sustained against one parent, S.S., leaving T.S. willing and able to care for his daughter. Accordingly, counsel for R.S. moved to dismiss the CINA petition and requested that the juvenile court grant custody to T.S., pursuant to Cts. & Jud. Proc. § 3-819(e).[14] The juvenile court denied the request because the CINA petition was not dismissed once T.S. was found to be an able and willing parent.[15] Operating under the assumption that it was too late to dismiss the CINA petition because it was not dismissed "at the time of adjudication," the juvenile court concluded that the ICPC applied to the request. T.S. requested, and the juvenile court granted, an order expediting the ICPC home study.

In a June 2017 status report prepared by the Department, it was reported that T.S. had transitioned to weekly unsupervised visits and that he continued to attend every scheduled visit. It was also reported that R.S. had begun to recognize T.S. as her "daddy." Over time, R.S. told T.S. that she loved him, gave him kisses, and expressed a desire to speak with him on the phone in between visits. The report also noted that R.S. was staying

---

[14] Cts. & Jud. Proc. § 3-819 (e) provides: "If the allegations in the petition are sustained against only one parent of a child, and there is another parent available who is able and willing to care for the child, the court may not find that the child is a child in need of assistance, but, before dismissing the case, the court may award custody to the other parent."

[15] The juvenile court incorrectly stated that the prior adjudication of the petition was "an adjudication of the child for purposes of facts sustained against both parents, even if the father was not involved in it, even if there were no allegations specifically against him[,]" because neither party had demonstrated that there was a "fit[,] able and willing[]" parent "at the time of the adjudication[.]"

7

overnight with T.S. and the paternal grandparents. However, a Delaware social worker did not believe that placement with T.S. was appropriate.

On June 26, 2017, the juvenile court held the final disposition hearing. The Department advised the juvenile court that Delaware denied T.S.[16] as a viable placement option after conducting the ICPC home study, but that the paternal grandparents, with whom T.S. resided, were being considered as a placement option. The Delaware social worker who conducted the home study deemed a placement with T.S. inappropriate because T.S. suffered from memory loss and had been forgetful in following up with her. In turn, the social worker was concerned that T.S.'s "disability" would impede his ability to care for R.S. Counsel for R.S. again argued that T.S. was entitled to custody and that the ICPC did not apply to placement with T.S. because the compact "only applies to foster care or pre-adopt placements."

The juvenile court considered whether the court could "go back [to the adjudicatory hearing] and say dad is fit and we should dismiss the CINA[,]" absent any evidence of concerns regarding paternity or fitness. The juvenile court determined that the court was not positioned to do so. She "ma[d]e no finding as to [T.S.]'s ability to care for [R.S.][,]" but noted that the Delaware social worker rejected T.S. as a potential placement. The juvenile court then recommended that R.S. remain in foster care, under the custody of the Department, adding that limited guardianship should be with the Department and paternal

---

[16] The Department had not received a full written report from the Delaware social worker denying the placement, but the Delaware social worker provided verbal notice of the denial.

8

grandparents jointly. The juvenile court also recommended that the Department facilitate 28-day visits with T.S. and the paternal grandparents, pending completion and approval of the ICPC home study.

In the interim, T.S. and the paternal grandparents continued to develop a relationship with R.S. The Department noted that R.S. appeared happy during her visits with her paternal family and that the extended 28-day visits went well. The foster parents also reported a "positive difference" in R.S. since the extended visits were introduced. As such, the Department recommended that the permanency plan be "relative placement" in Delaware with the paternal grandparents.

***August 2017- February 2018: "Permanency Plan" and Review Hearings; Placement with Paternal Grandparents***

During the August 28, 2017 hearing, counsel for R.S. and the juvenile court disagreed regarding the applicability of the ICPC. The juvenile court found, against the objections of counsel for R.S., that R.S. should be placed with the paternal grandparents, upon completion of their ICPC home study.

On November 13, 2017, the parties returned for a review hearing. There, the Department advised the juvenile court that the results of the ICPC home study were still pending and R.S. was unsuccessful in persuading the court to grant custody to T.S. T.S. informed the court that he was "ready, willing, and able to care for R.[S.]" On November 20, 2017, the Department received the final ICPC home study, which recommended placement with the paternal grandparents under an order of protective supervision. The report was subsequently submitted to the juvenile court for consideration.

On December 11, 2017, the Department requested that the court place R.S. with her paternal grandparents in accordance with the ICPC final report. T.S. and the paternal grandfather testified regarding T.S.'s fitness and ability to be a good father. The juvenile court indicated that T.S. could have challenged Delaware's ICPC findings regarding parental fitness, but the juvenile court could no longer "overrule" Delaware's determination, because R.S. was already a CINA, and T.S. did not appeal the ICPC home study findings.[17] Accordingly, the juvenile court recommended that custody be awarded to R.S.'s paternal grandparents, with T.S. having unsupervised visitation with R.S. as often as possible.

T.S. and R.S. filed Exceptions to the custody and guardianship recommendation of the juvenile court, arguing that the court improperly denied custody to T.S. based on the unfavorable ICPC home study. The juvenile court held a hearing in February 2018, during which the Exceptions were denied and the court ordered the recommended placement. The juvenile court concluded that the ICPC applied to out-of-state placements with non-custodial, biological parents and that the ICPC home study was the only vehicle to investigate T.S.

---

[17] The ICPC appellate process varies from state to state, https://aphsa.org/AAICPC/AAICPC/icpc_faq_2.aspx#:~:text=11.%20,If%20place ment%20is%20denied%2C%20is%20there%20an%20appeal's%20process%3F,State%20 Page%20for%20that%20state (last visited July 27, 2020), archived at https://perma.cc/HD69-J37Z.

*January 2019:* **R.S. I** *and Joint Custody Award*

T.S. and counsel for R.S. appealed the order denying the Exceptions to the Court of Special Appeals, but the Court of Special Appeals dismissed the appeal as an "impermissible interlocutory appeal." *In re R.S.* ("*R.S. I*"), No. 33, Sept. Term 2018, slip op. at 1–4 (Md. App. Jan. 14, 2019). While *R.S. I* was pending in the Court of Special Appeals, the juvenile court continued to conduct review hearings. On January 24, 2019, the Department recommended that the court terminate the CINA proceedings and award joint legal and physical custody to T.S. and the paternal grandparents. According to the Department, T.S. advised his assigned caseworker that it would be preferable if he shared custody with his parents, because they assisted him during his visits with R.S. The juvenile court awarded joint custody to T.S. and the paternal grandparents. Counsel for R.S. appealed that decision to the Court of Special Appeals.

*August 2019: Proceedings Before the Court of Special Appeals in the Present Appeal*

In a well-reasoned reported opinion, the Court of Special Appeals vacated the CINA order and the custody determination. *In re R.S.* ("*R.S. II*"), 242 Md. App. 338, 215 A.3d 392 (2019). Applying a "plain-meaning" rule analysis to Fam. Law § 5-604, the Court of Special Appeals held that the ICPC does not apply to the out-of-state placement of a child with a biological parent.[18] *Id.* at 360–61, 215 A.3d at 405. The court reached its holding

---

[18] Fam. Law § 5-604 provides:

**Sending agency to comply with laws**

(a) No sending agency shall send, bring, or cause to be sent or brought into
(continued . . . )

11

( . . . continued)

any other party state any child for placement in foster care or as a preliminary to a possible adoption unless the sending agency shall comply with each and every requirement set forth in this section and with the applicable laws of the receiving state governing the placement of children therein.

## Notice of intention to send

(b) Prior to sending, bringing or causing any child to be sent or brought into a receiving state for placement in foster care or as a preliminary to a possible adoption, the sending agency shall furnish the appropriate public authorities in the receiving state written notice of the intention to send, bring, or place the child in the receiving state. The notice shall contain:

(1) the name, date and place of birth of the child.

(2) the identity and address or addresses of the parents or legal guardian.

(3) the name and address of the person, agency or institution to or with which the sending agency proposes to send, bring, or place the child.

(4) a full statement of the reasons for such proposed action and evidence of the authority pursuant to which the placement is proposed to be made.

## Supporting information

(c) Any public officer or agency in a receiving state which is in receipt of a notice pursuant to subsection (b) of this section may request of the sending agency, or any other appropriate officer or agency of or in the sending agency's state, and shall be entitled to receive therefrom such supporting or additional information as it may deem necessary under the circumstances to carry out the purpose and policy of this compact.

## Required notice concerning interests of child

(d) The child shall not be sent, brought, or caused to be sent or brought into the receiving state until the appropriate public authorities in the receiving state shall notify the sending agency, in writing, to the effect that the proposed placement does not appear to be contrary to the interests of the child.

12

based on the relevant statutory provisions governing placements in foster and pre-adoptive homes. *See* Fam. Law § 5-604(a). The Court of Special Appeals reasoned that (1) "placement with a parent is not a placement 'preliminary to a possible adoption'" because biological parents do not have the ability to "adopt" their own children; and (2) "placement with a parent is not a 'placement within foster care[]'" because foster care refers to the placement of children "out of the homes of their biological parents." *Id.* at 360, 215 A.3d at 405 (citing *In re Yve S.*, 373 Md. 551, 574, 819 A.2d 1030, 1044 (2003)).

Before the Court of Special Appeals, the Department argued that the Association of Administrators[19] of the ICPC adopted guidelines for state regulations, which elaborated on the definitions of "foster care" and "pre-adoptive care" to expressly include placement with biological parents. *See* Fam. Law § 5-604(a). The version of the ICPC adopted in Maryland did not explicitly define foster care or pre-adoptive care. Accordingly, the Court of Special Appeals rejected those regulations as contrary to the plain language and legislative intent behind the ICPC. *Id.* at 363, 215 A.3d at 407. The Court also argued that applying the ICPC to placements with non-custodial, biological parents deprived T.S. of his constitutional right to parent, absent a finding of unfitness. *Id.* at 366, 215 A.3d at 409. The Court remanded the matter to the juvenile court for a "hearing to determine father's

---

[19] The Association of Administrators of the Interstate Compact on the Placement of Children ("AAICPC") was established in 1974. The organization "was given the authority to carry out the rules and terms of the Compact more effectively." https://www.aphsa.org/AAICPC/default.aspx (last visited July 27, 2020), archived at https://perma.cc/88W6-84CP.

actual custody preference[.]" *Id.* at 377, 215 A.3d at 415. The Department appealed. We granted *certiorari* on December 10, 2019 to consider these issues.

## STANDARD OF REVIEW

This Court utilizes three interrelated standards of review for child custody disputes. *Yve S.*, 373 Md. at 586, 819 A.2d at 1051 (internal citations omitted). First, we review factual findings by the juvenile court for clear error. *Id.* Second, whether the juvenile court erred as a matter of law is reviewed without deference to the juvenile court, i.e., under a *de novo* standard. *In re Adoption of Jayden G.*, 433 Md. 50, 96, 70 A.3d 276, 303 (2013). "If it appears that the [juvenile court] erred as to matters of law, further proceedings in the trial court will ordinarily be required unless the error is determined to be harmless." *Yve S.*, 373 Md. at 596, 819 at 1051. Third, the final conclusion of the juvenile court, when based upon "sound legal principles" and factual findings that are not clearly erroneous, will stand, unless there has been a clear abuse of discretion. *Id.*

In determining whether the juvenile court abused its discretion, we recognize that "[q]uestions within the discretion of the [juvenile] court are much better decided by the trial judges than by appellate courts, and the decisions of such judges should only be disturbed where it is apparent that some serious error or abuse of discretion or autocratic action has occurred." *In re Adoption of Cadence B.*, 417 Md. 146, 155, 9 A.3d 14, 20 (2010) (internal citations omitted). A reviewing court will not disturb findings that fit squarely within the discretion of the trial court, unless the decision under review is "well removed from any center mark imagined by the reviewing court and beyond the fringe of what the court deems minimally acceptable." *In re Adoption/Guardianship No. 3598*, 347

14

Md. 295, 313, 701 A.2d 110, 119 (1997) (internal citations omitted). In the case at bar, we review the statutory interpretation and application of the ICPC *de novo* and the final CINA order and custody determination for an abuse of discretion.

## DISCUSSION

### I. Background on the ICPC

To facilitate our resolution of the issues presented, it is useful to discuss the history of the ICPC. The ICPC is a binding contractual agreement among all fifty states, the District of Columbia, and the U.S. Virgin Islands regarding the interstate placement of children.[20] *In re C.B.*, 188 Cal. App. 4th 1024, 1031, 116 Cal. Rptr. 3d 294, 299 (2010). Reciprocal statutes codifying the terms of the ICPC have been enacted by the legislatures of each party state. *In re Alexis O.*, 157 N.H. 781, 784, 959 A.2d 176, 180 (2008). The authority to enter into interstate compacts like the ICPC is derived from the Compact Clause of the United States Constitution, which provides, in part, that "[n]o State shall, without the Consent of Congress . . . enter into any Agreement or Compact with another State, or with a foreign power[.]" U.S. Const. art. I, sec. 10, clause 3. Unlike many other interstate compacts which may require congressional approval, the ICPC does not require

---

[20] DONALD N. DUQUETTE ET AL., CHILD WELFARE LAW & PRACTICE: REPRESENTING CHILDREN, PARENTS, AND STATE AGENCIES IN ABUSE, NEGLECT, AND DEPENDENCY CASES § 19.4, 475 n.13 (3d. 2016) ("A revised ICPC has been drafted, but it will not come into force until 35 states have adopted it. As of January 2016, only [twelve] states (Alaska, Delaware, Florida, Indiana, Louisiana, Maine, Minnesota, Missouri, Nebraska, Ohio, Oklahoma, and Wisconsin) had adopted the new version.").

such approval[21] because it concerns matters traditionally of state concern—the care and custody of children. Bernadette W. Hartfield, *The Role of the Interstate Compact on the Placement of Children in Interstate Adoption*, 68 NEB. L. REV. 294 (1989).

The ICPC was drafted and advanced by the New York State Legislative Committee on Interstate Cooperation, as the result of the efforts of social services administrators who were concerned that jurisdictional limitations impeded their ability to investigate the suitability of an out-of-state placement and to properly monitor the child once a placement had been made. DUQUETTE ET AL., CHILD WELFARE LAW & PRACTICE, at 476. Social service agencies have noted that, from the late 1950s to the 1970s, the population of children in the foster care system increased dramatically. Vivek S. Sankaran, *Out of State and Out of Luck: The Treatment of Non-Custodial Parents Under the Interstate Compact on the Placement of Children*, 25 YALE L. & POL'Y REV. 63, 71 n.36 (Fall 2006) (citing Tim Hacsi, *From Indenture to Family Foster Case: A Brief History of Child Placing*, 74 Child Welfare 162, 174 (1995) ("During the 1960s and 1970s . . . the foster care population exploded, reaching its peak in the late 1970s." (citation omitted))). The thought behind the ICPC was that, by removing the barriers to interstate placement, there would be more placements available for vulnerable children in the foster care system.

The Council for State Governments recommended the adoption of the ICPC. The final draft of the ICPC was approved by a twelve-state conference in January 1960. Shortly

---

[21] Although individual states do not need consent, the government of Canada or its provinces may join the ICPC with congressional approval. Hartfield, *Role of the Interstate Compact*, at 295.

16

thereafter, New York became the first state to enact the ICPC. Maryland followed suit in 1975.

As stated, the purpose of the ICPC is to facilitate interstate adoption and maximize the number of "acceptable homes for children in need of placement." *In re Adoption/Guardianship No. 3598*, 347 Md. at 314, 701 A.2d at 119 (internal citations omitted). It does so by "extend[ing] the jurisdictional reach of a party state into the borders of another party state for the purpose of investigating a proposed placement and supervising a placement once it has been made." *In re Adoption No. 10087*, 324 Md. 394, 404, 597 A.2d 456, 461 (1991) (citing Hartfield, *Role of the Interstate Compact*, at 296).

The ICPC requires the sending state to notify the receiving state prior to placement of the child in the receiving state. ICPC, art. III. Afterwards, the out-of-state resident must undergo a pre-placement home study to ascertain whether they are a viable placement option. If the state Compact Administrator[22] does not approve the placement, the ICPC prohibits the sending state from moving forward with the placement. Upon approval of the placement, the sending state maintains jurisdiction over and financial responsibility for the child, while the receiving state supervises the child and ensures the placement remains suitable. ICPC, art. I. The receiving state may also provide post-placement services, which are paid for by the sending state. ICPC, art. V(b).

---

[22] Each state designates a compact administrator. The administrators in each state work together to promulgate model rules and regulations regarding the administration of the ICPC. *See* ICPC, art. VII.

17

## II. Parties' Contentions

The Department contends that the ICPC applies to the out-of-state placement of a child with a parent, when a court or local department of social services is the entity placing the child across state lines. The Department argues that the Court of Special Appeals misinterpreted the statutory provisions codifying the ICPC. *See* Fam. Law §§ 5-601–5-611. The Department further asserts that the Court of Special Appeals ignored the plain language of Fam. Law § 5-611 in reading Fam. Law § 5-604. The Department asserts that this was erroneous because Sections 5-601 through 5-611 must be read in conjunction with one another. According to the Department,

> [t]he ICPC is designed to foster interstate cooperation and to ensure that children placed across state lines are in safe and appropriate environments, with access to necessary services to address their needs for health, safety, and well-being. . . . Fam. Law § 5-602 (internal citations omitted). Therefore, the ICPC is to be "liberally construed to effectuate [its] purposes." [Fam. Law] § 5-611.

Relying on precedent from this Court, the Department asserts that Fam. Law § 5-609 merely sets forth an exemption—not a bar—to the application of the ICPC to relatives, including parents, and this rule only governs if "the child must be brought or sent to the receiving state by [a relative or guardian][.]" *See In re Adoption of Cadence B.*, 417 Md. at 158 n.11, 9 A.3d at 21 n.11 (stating that the ICPC applies to the out-of-state placement of the child with their relative or guardian, so long as the child is not brought or sent to the receiving state by a relative or guardian). According to the Department, "th[is] exemption does not apply [to biological relatives] when a *court* or child-placement *agency* places a child with an out-of-state parent." (emphasis in original).

18

In addition, the Department argues that the ICPC Regulations[23] and COMAR 07.02.11.28 supplement the definitions of "foster care" and "pre-adoptive care" under the ICPC to expressly include out-of-state placements with parents. The Department further asserts that, contrary to the view adopted by the Court of Special Appeals, these regulations are valid because administrative agencies "have the authority to fill any gap left, implicitly or explicitly, in the statutes." *See* ICPC Reg. 3(4)(26). The Department also maintains that the juvenile court did not err by ordering an ICPC home study for T.S. because there are few other ways for the court and the local social services to determine whether a placement outside of its jurisdiction is safe and suitable. The Department asserts that, in light of the ICPC home study and other evidence concerning parental fitness, the juvenile court properly awarded joint legal and physical custody to T.S. and his parents.

Counsel for R.S. counters that a plain language reading of the ICPC suggests that the ICPC does not apply to the out-of-state placement of a child with a parent, because placement with a biological parent is not a "placement in foster care *or* as preliminary to a possible adoption[,]" and because the juvenile court did not find T.S. was unfit, the CINA petition should have been dismissed and sole custody awarded to T.S.[24] *See* Fam. Law § 5-604(a) (emphasis added). We agree.

---

[23] The text of the ICPC Regulations drafted by the AAICPC is available at https://aphsa.org/OE/AAICPC/ICPC_Regulations.aspx (last visited July 29, 2020), archived at https://perma.cc/XM65-CGLF.

[24] In addition to the contentions raised by the parties, the National Association of Counsel for Children filed an Amicus Curiae Brief in support of the position advanced by counsel for R.S. Maryland Legal Aid filed an Amicus Curiae Brief in support of the result advocated for by the Department.

### III. Analysis

#### A. Interpretation of the Statutory Language

In construing the meaning of a statute, this Court applies the canons of statutory construction to ascertain the intent of the General Assembly. *Kaczorowski v. Mayor & City Council of Balt.*, 309 Md. 505, 511, 525 A.2d 628, 631 (1987). As such, we begin by examining the plain meaning of the statutory language. *Agnew v. State*, 461 Md. 672, 679, 197 A.3d 27, 31 (2018). "If the language of the statute is unambiguous and clearly consistent with the statute's apparent purpose, our inquiry as to legislative intent ends ordinarily and we apply the statute as written, without resort to other rules of construction." *Lockshin v. Semsker*, 412 Md. 257, 275, 987 A.2d 18, 28–29 (2010). However, we do not consider the "statutory language in a vacuum[.]" *Id.* at 275, 987 A.2d at 29. Instead, we read the plain language in light of the "purpose, aim, or policy of the [General Assembly] in enacting the statute." *Id.* at 276, 987 A.2d at 29.

Where the statutory language is "subject to more than one reasonable interpretation," or its meaning is not clear when considered in conjunction with other statutory provisions, we may glean the legislative intent from external sources. *Id.*, 987 A.2d at 29. Whether the statutory language is clear or ambiguous, "it is useful to review [the] legislative history of the statute to confirm that interpretation and to eliminate another version of the legislative intent alleged to be latent in the language." *Blackstone v. Sharma*, 461 Md. 87, 113, 191 A.3d 1188, 1203 (2018) (internal citations omitted). "In every case, the statute must be given a reasonable interpretation, not one that is absurd, illogical, or

incompatible with common sense." *Lockshin*, 412 Md. at 276, 987 A.2d at 29 (internal citations omitted).

Fam. Law § 5-604 provides, "[n]o sending agency shall send, bring, or cause to be sent or brought into any other party state any child for *placement in foster care or as preliminary to possible adoption*[,] unless the sending agency shall comply with each and every requirement set forth in this section and with the applicable laws of the receiving state governing the placement of children therein." (emphasis added). The statutory provisions governing the placement of children across state lines "shall be liberally construed to effectuate" the legislative purpose of the ICPC, which is to ensure that children needing placements receive the "maximum opportunity" to be placed in a safe environment, without the jurisdictional barriers to investigation and supervision. *See* Fam. Law § 5-611 and § 5-602(1). Based on the plain, unambiguous language of the relevant statutory provisions, we hold that the ICPC does not apply to interstate placements with non-custodial biological parents. We explain.

1. "Placement" in "foster care" or "preliminary to a possible adoption" does not include placement with parents.

There is a split of authority regarding whether the language of the ICPC applies to out-of-state placements with non-custodial biological parents. Some jurisdictions have held that the ICPC Model Regulations, which expressly include placements with biological parents, are of legal force. *See, e.g., Dep't of Children & Families v. C.T.,* 144 So. 3d 684 (Fla. Dis. Ct. App. 2014); *Green v. Div. of Family Servs.*, 864 A.2d 921 (Del. Sup. Ct. 2004); *Arizona Dep't of Econ. Sec. v. Leonardo,* 200 Ariz. 74, 22 P.3d 513 (Ct. App. 2001).

21

Others have concluded that the Model Regulations are inapplicable because they expand the ICPC beyond its intended purpose. *See, e.g., In Emoni W.*, 305 Conn. 723, 48 A.3d 1 (2012); *In re Dependency D.F.-M.*, 157 Wash. App. 179, 236 P.3d 961 (2010); *Ark. Dep't of Human Servs.*, 347 Ark. 553, 65 S.W.3d 880 (2002). We join those jurisdictions that have held that the ICPC does not apply to placements with non-custodial biological parents, because both the statutory language and legislative history confirm that the ICPC was not intended to apply to this category of out-of-state placements.

As noted by the Court of Special Appeals, "placement" is defined as "the arrangement for the care of a child in a family free or boarding home or in a child-care agency or institution." *R.S. II*, 242 Md. App. at 359, 215 A.3d at 404 (citing Fam. Law § 5-603(4)). The definition of "placement" limits the available sites where an agency or person may send a child for pre-adoptive or foster care to a "family free or boarding home" or "a child care agency or institution." A "family free" home is not defined under the ICPC or by our case law. Accordingly, we survey the case law in other participating states to shed light on the statutory language.

Other states have defined "family free home" as "a home that provides care for a child similar to that which a family would provide, but that, unlike a boarding home, charges no fee for this care." *In re Alexis O.*, 157 N.H. at 787, 959 A.2d at 182 (internal citations omitted). In *In Re Dependency of D. F.-M.*, the intermediate appellate court in Washington, defined the term in a similar manner. According to that court, both "family free" and "boarding" homes are "nonparental residential arrangements that provide children with the kind of care usually received from parents." 157 Wash. App. at 188–89,

22

236 P.3d at 965. Both terms refer to a type of "foster home" and do not appear to contemplate situations where the home of an out-of-state biological parent, whose parental rights are still intact, would constitute a "placement" under the ICPC. Madelyn D. Freundlich, *Reforming the Interstate Compact on the Placement of Children: A New Framework for Interstate Adoption*, 4 UNIV. OF PENN. J. OF L. & POL'Y 15 (1997).

Additionally, the statutes comprising the ICPC do not expressly define "foster care." Other sections of the Maryland Code provide useful definitions. For example, Section 5-501(c) of the Family Law Article defines "foster care" as "24-hour care and supportive services provided for a minor child placed by a child placement agency in an approved family home." A prior iteration of the definition of "foster care"—enacted three years after Maryland passed the ICPC—defined the term as "a service which provides care and supportive service in a family home or group facility for the child who cannot be cared for by his [or her] *own* family[.]" 1978 Md. Laws, Ch. 980 (emphasis added). The 1977 COMAR regulations similarly stated that the "goals of foster care include[d,]" "[p]roviding foster family or group care for the child whose parents or relatives cannot maintain a home for him [or her] in accordance with his [or her] individual needs[.]" 4 Md. Reg. 1305 (Aug. 17, 1977). At the time, these regulations and statutory provisions defined "foster care" as a type of "substitute care" for a child who "cannot be cared for by his [or her] own family[.]" *See id.*; *see also* 16 Md. Reg. 509 (Feb. 24, 1989); 1978 Md. Laws, Ch. 980.

The Department argues that "foster care" includes parental care, noting that Maryland receives federal reimbursement for children in "foster care" under Title IV-E of the Social Security Act, and when a foster child is placed with a parent for a "trial home

23

visit," the parent may receive foster care maintenance payments.[25]  A "trial home visit,"

"occurs when the child *has been in a foster care placement*, but, under continuing State

agency supervision, is then *returned to the principal caretaker* for a limited and specified

period of time."[26]  We fail to see how this entitlement to reimbursement equates a parental

placement with a "foster care" placement, particularly in light of this definition of "trial

home visit."  In fact, the "foster care placement" appears to be separate and distinct from

the parental "trial home visit." *See* 45 C.F.R. § 1355.20 (defining foster care as "24-hour

substitute care for children placed away from their parents or guardians and for whom the

title IV–E agency has placement and care responsibility").  We agree with the Court of

Special Appeals that "foster care" has always been interpreted as a type of "out-of-home"

---

[25]  *See Child Welfare Policy Manual*, 8.3C.5 TITLE IV-E, Foster Care Maintenance Payments Program, State Plan/Procedural Requirements, Trial Home Visit (U.S. Dep't of Health & Hum. Servs. 2020), https://www.acf.hhs.gov/cwpm/public_html/programs/cb/laws_policies/laws/cwpm/policy_dsp.jsp?citID=93 (last visited on July 28, 2020), archived at https://perma.cc/ZR3N-4KQN; *but see* 8.2B.1 TITLE IV-E, Adoption Assistance Program, Eligibility, Biological Parents, (U.S. Dep't of Health & Hum. Servs. 2020), https://www.acf.hhs.gov/cwpm/public_html/programs/cb/laws_policies/laws/cwpm/policy_dsp.jsp?citID=52 (last visited on August 11, 2020), archived at https://perma.cc/5LDE-FFYB ("Title IV-E foster care maintenance payments are available for AFDC-eligible children who have been removed from their own homes and placed in a foster family home or child care institution. By definition, foster care is provided by someone other than a biological parent.").

[26]  1.2B.7, *Adoption and Foster Care Analysis and Reporting System (AFCARS), Data Elements and Definitions, Foster Care Specific Elements, Placements* (Updated June 10, 2020) (emphasis added), https://www.acf.hhs.gov/cwpm/public_html/programs/cb/laws_policies/laws/cwpm/policy_dsp_pf.jsp?citID=150 (last visited July 27, 2020), archived at https://perma.cc/AXQ6-R6JE; *see also* 45 C.F.R. § 1355 Apx. A, Section I.V.A.

placement, and out-of-home placement means placement in a home apart from that of the biological parents. *In re Yve S.*, 373 Md. at 574, 819 A.2d at 1044.

The Court of Special Appeals also "ha[d] no problem concluding that a placement with a parent [was] not a placement 'preliminary to possible adoption[]'" because "natural parents (at least ones whose parental rights have not been terminated) do not adopt their own children[.]" *R.S. II*, 242 Md. App. at 359–60, 215 A.3d at 405 (analyzing definitions of "party" in Fam. Law § 5-301(h)(2), the Court of Special Appeals reasoned that the General Assembly has long made the distinction between the child's "parent" and "the individual seeking adoption"); *see also* Fam. Law § 5-301(g)(1) ("parent" means mother or a man whose paternity is established under Fam. Law § 5-306). We agree. The interpretation advocated by the Department would require this Court to find that pre-adoptive care includes placement in the care of a parent whose parental rights remain intact. *See Carroll v. Konits*, 400 Md. 167, 192–93, 929 A.2d 19, 35 (2007) (reiterating that statutes should not be interpreted illogically or in a way that is inconsistent with common sense). Reading the aforementioned sections of the Family Law Article in conjunction with one another, particularly Fam. Law § 5-604 and 5-501, it is clear that the pre-adoptive placement language in Fam. Law § 5-604 refers to placement in the home of an individual seeking adoption and that is distinct from the biological parent. *See* Fam. Law § 5-301(h)(2).

Other states have reached the same conclusion. In *In re D.B.,* for example, the mother of a two-year-old child in need of services was killed by her boyfriend in the course of a murder-suicide. 43 N.E.3d 599, 601 (Ind. Ct. App. 2015). The child was in the home

25

at the time. *Id.* She was subsequently removed from the home and placed in the custody of Department of Child Services ("DCS"). *Id.* at 602. Her biological father resided in Minnesota, while the child and her mother resided in Indiana. *Id.* at 601. The child did not have contact with her father past the first four months of her life. *Id.* Her father contacted DCS when he learned about the murder. *Id.* at 602. DCS began the ICPC process to determine whether the father was a suitable placement. *Id.* He appealed, arguing that the ICPC was inapplicable to placement with a biological parent. The Court of Appeals of Indiana began by analyzing the plain language of the ICPC (and the state statute adopting the same language). According to the court, "the plain language of the statute makes clear that the ICPC only applies to the placement of a child in foster care or as a preliminary to a possible adoption[]" and "[a] biological parent is neither[.]" *Id.* at 604 (footnote omitted). The Court reasoned that foster care and pre-adoptive care are "substitutes for parental care" that do not include care provided by the biological parents. *Id.* (citing *McComb v. Wambaugh*, 934 F.2d 474, 481–82 (3d Cir. 1991) (holding that the ICPC does not apply to parental placements because they do not constitute "substitutes to parental care").

The same year, the United States Court of Appeals for the Third Circuit held that the clear and unambiguous language of the Pennsylvania statute enacting the ICPC does not apply to placements with biological parents. In *McComb v. Wambaugh*, the court considered whether the "[ICPC] applies when a court in one state directs that a child be taken from foster care and sent to a natural parent in another participating state." *Id.* at 479. The *Wambaugh* Court conducted a thorough analysis of the history of the compact,

finding that neither the drafters of the compact nor the state legislature intended the compact to apply to natural parents. According to the Third Circuit,

> The detailed draftsman's notes, supplied by the Council of State Governments, reinforce the notion that the [c]ompact does not apply to parental placements. The notes state that [ICPC] Article VIII 'exempts certain close relatives. This was done in order to protect the social and legal rights of the family and because it is recognized that regulation is desirable only in the absence of adequate family control or in order to forestall conditions which might produce an absence of such control.'

*Id.* at 481 (quoting *Draftsman's Notes on Interstate Compact on the Placement of Children, reprinted in* Roberta Hunt, *Obstacles to Interstate Adoption* 44 (1972)). The court reasoned that this interpretation was consistent with longstanding interests in preserving the fundamental right to parent. *Id.* (quoting *Santosky v. Kramer*, 445 U.S. 745, 753, 102 S. Ct. 1388, 1394–95 (1982)) ("The fundamental liberty interest of natural parents in the care, custody, and management of their child does not evaporate simply because they have not been model parents or have lost temporary custody of their child to the State.").

The Department argues that the plain language of Fam. Law § 5-609(1) is dispositive of whether the ICPC applies to placements with biological parents, when the "sending agency" is the court or a local social services agency. This provision should not be treated as an exhaustive list of situations, in which the ICPC *does not* apply. The text of the statute plainly states,

> [t]his compact shall not apply to:
>
> > (1) the sending or bringing of a child into a receiving state by the child's parent, step-parent, grandparent, adult brother or sister, adult uncle or aunt, or guardian and leaving the child with any such relative or non-agency guardian in the receiving state.

Fam. Law § 5-609(1). "[I]n order for this exception to apply, 1) the child must be brought or sent to the receiving state by any of the aforementioned relatives or guardian; *and* 2) the child must be left with any such relative." *Cadence B.*, 417 Md. at 158 n.11, 9 A.3d at 21 n.11 (internal citation omitted) (emphasis in original). This is not to say that the *only* time the ICPC does not apply to an "out-of-state placement" is when one of the aforementioned relatives sends or brings the child across state lines and leaves the child with another relative or non-agency guardian in that state.

Additionally, the plain language of both Fam. Law § 5-604 and § 5-609 is consistent with the stated purpose of the drafters, which was to facilitate interstate placements in foster and pre-adoptive care, without interfering with parents' ability to plan for the care of their own children. Sankaran, *Out of State and Out of Luck*, at 70–71 ("The plain language of these provisions evinces the intent of the drafters to respect the integrity of the family and to allow parents to plan for the care of their own children[,] unless the children were being placed in foster care or were being adopted."). Thus, neither the plain language nor the legislative history compel us to extend the ICPC to out-of-state placements with non-custodial biological parents.

2. Maryland Legislative History: Adoption of the ICPC

Our legislative history provides further support for the aforementioned plain language reading of the ICPC. In 1975, when the Maryland General Assembly adopted the ICPC, there were no substantive changes. 1975 Md. Laws Ch. 266 (S.B. 18). In a report authored by the Senate Judicial Proceedings Committee, prior to enacting the ICPC in the State, the committee provided the following explanation:

28

Twenty-three states have already adopted this legislation and have found it of great assistance in providing uniform protection and services for children on an interstate basis. It provides uniformity of procedure in an area where it is sorely needed as the best interests of the child are often best served by placement outside the state of domicile. *Those situations to which the [C]ompact primarily addresses itself are (1) placement preliminary to possible adoption; (2) placement in foster care when no adoption is likely to occur*, and (3) placement of children adjudicated delinquent in an institution of another state. Each child requiring placement will receive the maximum opportunity to be placed in a suitable environment and *with persons or institutions having appropriate qualifications and facilities to provide a necessary and desirable degree and type of care.*

Judicial Proceedings Committee Report to the General Assembly of 1975, Proposed Bills, No. 8-3. (emphasis added). It is clear that the General Assembly, like the original drafters of the ICPC, intended for the ICPC to have limited application. In particular, this explanation of the bill indicates that the ICPC is a mechanism for state social services agencies to ensure that children are placed with "persons or institutions having appropriate qualifications and facilities" to provide the appropriate care. Inherent in this explanation of the bill is the idea that placement of a child in foster or pre-adoptive homes refers to placement in substitute homes, with individuals who can provide care similar to that which the child's biological parent would normally provide. The committee notes from the Judicial Proceedings Committee also reflect that members of the General Assembly coordinated with Dr. Mitchell Wendell, who was the principal drafter of the ICPC for the New York Legislative Committee. Dr. Wendell co-authored at least two articles post-adoption of the ICPC that explained the scope of the ICPC was limited to "children placed with would-be parents as preliminary to a possible adoption [] and children placed in foster care where no adoption is contemplated." *See, e.g.*, Brendan Callanan & Dr. Mitchell

29

Wendell, *The Interstate Compact on the Placement of Children*, 26 JUV. JUST. 41, 44 (1975). Our legislative history is consistent with this view.

3. <u>ICPC and Maryland COMAR Regulations</u>

The Court of Special Appeals was also correct to disregard ICPC Regulations as "invalid." The ICPC regulations, developed by the Association of Administrators of the Interstate Compact on the Placement of Children ("AAICPC"), and their Maryland equivalent, the COMAR, expand the express language of the compact beyond its intended purpose and logical meaning, because the ICPC regulations include placements with parents. A regulation cannot be upheld if it conflicts with the statute under which it was promulgated. *McClanahan v. Wash. Cty. Dep't of Soc. Servs.,* 445 Md. 691, 708, 129 A.3d 293, 303 (2015). Regulation No. 3 outlines four placement categories, requiring compliance with the ICPC: "[(1)] Adoptions: Placement preliminary to an adoption (independent, private, and public adoptions)[,] [(2)] [l]icensed or approved foster homes (placement with related or unrelated caregivers)[,] [(3)] [p]lacements with parents and relatives when a parent or relative is not making the placement[,] [and (4) g]roup homes/residential placement of all children[.]" However, these "placement categories" contradict the very language of the underlying statute. *McClanahan*, 445 Md. at 708, 129 A.3d at 303.

The Department similarly relies on the COMAR regulations to argue that "foster care" and "preliminary to possible adoption" placements include out-of-state parental homes. Pursuant to Md. Code, Human Services Article ("Hum. Servs.") §§ 4-204(b)(2) and 4-207, the Executive Director of the Social Services Administration of Maryland,

30

Department of Human Services may "adopt regulations necessary to carry out the duties imposed on the Executive Director by law[.]" Hum. Servs. § 4-207(a). Accordingly, the Executive Director has adopted regulations regarding out-of-state placements under the ICPC. COMAR 07.02.11. Under these regulations, "[a]ll placements of children for out-of-home placement or as preliminary to possible adoption in Maryland from another state shall comply with the requirements of the [ICPC.]" COMAR 07.02.11.28(A)(1). COMAR 07.02.11.28(C) further states, "[w]hen a foster child is to be placed out-of-State *with a non-custodial parent, relative, or guardian*, the local department shall ensure that the requirements for an interstate placement are met." (emphasis added). As discussed above, a plain language reading of the ICPC and the relevant statutory provisions (as well as the associated drafting and legislative history) reflect that the ICPC is limited to foster care and pre-adoptive placements, neither of which include placements with non-custodial, biological parents.[27] Therefore, any regulation purporting to expand the application of the ICPC to out-of-state placements with a non-custodial, biological parent is impermissible and will not be given the force of law.

### 4. The Fundamental Right to Parent

We share the concern expressed by the Court of Special Appeals that, in applying the ICPC, the juvenile court deprived T.S. of his constitutional right to parent. The Supreme Court of the United States has reiterated that parents have a constitutional right to the "care, custody, and control of their children." *Troxel v. Granville*, 530 U.S. 57, 65,

---

[27] *See* discussion *supra* Section III.A.1.

31

120 S. Ct. 2054, 2060 (2000). We have emphasized this principle, stating that "[s]uch rights are so fundamental that they cannot be taken away unless clearly justified." *In re Billy W.*, 386 Md. 675, 684, 874 A.2d 423, 428 (2005). "This liberty interest, protected by the Fourteenth Amendment[28] to the United States Constitution, [o]ccupies a 'unique place in our legal culture, given the centrality of family life as the focus for personal meaning and responsibility' and is 'essential to the orderly pursuit of happiness.'" *In re Ashley S.*, 431 Md. 678, 683–84, 66 A.3d 1022, 1025 (2013) (footnotes omitted).

This liberty interest extends to child protection cases. It is well-established that Maryland subscribes to the policy of *parens patriae*, allowing the State to intervene against a neglectful, abusive, or otherwise unfit parent to protect the best interests of the child. *Boswell v. Boswell*, 352 Md. 204, 218–19, 721 A.2d 662, 669 (1998) ("'*Parens patriae*'" "refers to the 'principle that the state must care for those who cannot take care of themselves, such as minors.'" (internal citations omitted)). However, the State may not interfere with the fundamental right to parent without sufficient justification. *Ashley S.*, 431 Md. at 684, 66 A.3d at 1025 (The right to parent "must be balanced against society's obligation, exercised through the State, to ensure the child's welfare.") (footnote omitted).

In *Stanley v. Illinois*—"the first child protection case to reach the [United States] Supreme Court[]"[29]—the Supreme Court held that, "as a matter of due process of law,

---

[28] U.S. Const., amend XIV, § 1 (requiring that no "State [shall] deprive any person of life, liberty, or property, without due process of law[]").

[29] DUQUETTE ET AL., CHILD WELFARE LAW & PRACTICE § 16.2, at 390.

Stanley was entitled to a hearing on his fitness as a parent before his children were taken from him[.]" 405 U.S. 645, 649, 92 S. Ct. 1208, 1211 (1972). There, Illinois passed a law under which, the children of unwed fathers were declared legal dependents of the state without a hearing to determine parental fitness or proof of neglect on the part of the unwed father.[30] *Stanley*, 405 U.S. at 646, 92 S. Ct. at 1210. After the death of his children's mother, Peter Stanley was denied custody of his children, who were, instead, placed in the care of court-appointed guardians. *Id.* at 647, 92 S. Ct. at 1210. The State of Illinois argued that proof of fitness was not required because Stanley was not a legal parent. *Id.* at 647, 92 S. Ct. at 1210. Stanley appealed, citing Due Process and Equal Protection under the Fourteenth Amendment. *Id.* at 646, 92 S. Ct. at 1210. The Supreme Court recognized the power of the state to remove children from *neglectful* parents, but determined that, before a parent is denied custody, the state must prove that the parent is unfit, regardless of their marital status. *Id.* at 652, 92 S. Ct. at 1213. Thus, the Supreme Court held that the Illinois statute was unconstitutional and the juvenile court was required to hold a hearing to determine parental fitness. *Id.* at 659, 92 S. Ct. at 1216.

Similarly, the application of the ICPC to T.S. resulted in the denial of the protections afforded to him by the Fourteenth Amendment, simply because he was an out-of-state parent who did not have an established parent-child relationship with R.S. As a matter of public policy, any reading of the ICPC, which concludes that the compact applies to placements with biological parents (who have not been deemed unfit), would conflict with

---

[30] Under then-existing Illinois law, unmarried fathers were not afforded the legal rights of a parent.

state and federal constitutional law. Subjecting a biological parent—who has not relinquished his parental rights, had those rights been extinguished by a juvenile court, or has otherwise been determined to be unfit as a parent—to the procedural hurdles and delays associated with an ICPC investigation unnecessarily deprives the individual of the fundamental right to parent. *See* Ursula Gilmore et. al, *Delays in the Interstate Foster and Adoption Home Study Process*, 8 U.C. DAVIS J. JUV. L. & POL'Y 55, 57 ("Local [social] workers reported that several factors contributed to delays, including waiting too long for home studies from receiving states and procedural difficulty from within their own ICPC offices.") (footnote omitted).

Like Stanley, T.S. was never adjudicated unfit as a parent, nor were his parental rights terminated. As counsel for R.S. and the Court of Special Appeals noted, despite the availability of a biological parent with appropriate resources and support to care for the child, the juvenile court deferred making a permanent custody determination while the ICPC home study was being completed. In her report, the Delaware social worker cited "memory issues" as her primary reasoning for determining that an ICPC placement with T.S. was inappropriate. The ICPC process effectively allowed an out-of-state social services agency to deprive a presumably fit, biological parent of custody.

The ICPC home study process has virtually no judicial oversight, but still was used to deny T.S. custody. *See* Sankaran, *Out of State and Out of Luck*, at 80 ("[A]gency caseworkers have the power to effectively terminate the parent's relationship with the child by finding that the placement would be contrary to the child's interest, a wholly subjective standard."). This fact is supported by the weight of the Delaware social worker's denial of

T.S. as an appropriate placement, and the juvenile court's apparent deference to it. The juvenile court accepted this conclusion without ever finding that T.S. was unfit. A determination of fitness is essential when the fundamental right to parent is implicated. Therefore, the juvenile court erred in determining that the ICPC applied to out-of-state parental placements with non-custodial parents.

### 5. Alternatives to the ICPC

The Department argues the ICPC was the only available means for the Department and the juvenile court to investigate the suitability of an out-of-state placement with T.S.. The Department is mistaken. As recognized by the Court of Special Appeals, "Maryland [] ha[s] the option of requesting a courtesy check of the out-of-state, noncustodial parent's home." *R.S. II*, 242 Md. App. at 371, 215 A.3d at 412. This investigatory process is separate from the ICPC home study. Like the home study, the courtesy check is designed to verify the suitability of a potential home. In contrast, the administrators of the ICPC have acknowledged that the latter process is appropriate "[w]hen a sending court/agency seeks an independent (not ICPC related) courtesy check for placement with a parent from whom the child was not removed[.]" ICPC Reg. 3(b). Accordingly, neither the Department nor the juvenile court were without other options to investigate the safety and suitability of T.S.'s home.

### B. R.S. was not a CINA Because the Court Did Not Find That the Noncustodial Father was Unfit.

Having concluded that the ICPC does not apply to placements with non-custodial, biological parents, we turn to the CINA and custody implications. Throughout the

35

proceedings below, the juvenile court mistakenly asserted that T.S. could not be granted custody because he could not establish paternity or fitness at the December 2016 adjudicatory hearing, when the facts in the CINA petition were sustained. As a result, the juvenile court proceeded with the disposition hearing and ultimately determined that R.S. was a CINA.

The juvenile court must hold an adjudicatory hearing regarding the merits of the CINA petition to determine the veracity of the allegations in the petition. *In re Ashley S.*, 431 Md. at 685, 66 A.3d at 1026. Upon finding that the allegations are true, a disposition hearing is held. *Id.* During the dispositional phase, the juvenile court "determine[s] whether [the] child is a 'CINA,'" and if so, what action on the part of the court must be taken to protect the child. Cts. & Jud. Proc. § 3-819(a)(1). The juvenile court must conclude whether the child needs "'court intervention because: (1) [t]he child has been abused [or neglected]' [and] '(2) [t]he child's parents . . . are unable or unwilling to give proper care and attention to the child and the child's needs.'" *In re E.R.*, 239 Md. App. 334, 336 n.1, 196 A.3d 541, 542 n.1 (2018) (quoting Cts. & Jud. Proc. § 3-801(f)); *see also In re Karl H.*, 394 Md. 402, 416, 906 A.2d 898, 906 (2006) (reiterating that, to safeguard the due process rights of the parent(s) and child, the juvenile court must hold adjudicatory and dispositional hearings before a child is deemed a CINA and placed in the custody of the State); *In re Russell G.*, 108 Md. App. 366, 376–77, 672 A.2d 109, 114 (1996) (holding that "a child in the care and custody of a parent or parents is a CINA only if *both* parents are unable or unwilling to give the child proper care and attention[]" (emphasis in original)).

36

In the case at bar, the allegations of neglect were attributable to S.S. T.S. demonstrated his willingness to parent R.S. throughout the juvenile court proceedings. To the extent that the Department expressed concerns about T.S.'s fitness, the Department could have amended the CINA petition to include allegations against T.S., but did not do so. The Department was required to present evidence that T.S. was not "willing and able" to parent R.S. *See In re E.R.*, 239 Md. App. at 334, 196 A.3d at 541 (holding that the juvenile court could proceed on the "bare bones CINA petition[]" where the detailed factual allegations were sustained against one parent alone). As the juvenile court noted, once it established paternity, T.S. had all the "rights and responsibilities" of a proper parent. Therefore, in the absence of an express finding that T.S. was unfit, T.S. should not have been denied custody.

Despite this requirement, the juvenile court never concluded that T.S. was unable to care for R.S. Once paternity was established, the juvenile court was required to render a decision regarding the fitness of T.S.—or his ability and willingness to give proper care to the child. *See* Cts. & Jud. Proc. § 3-819(e). Instead of assessing fitness, the juvenile court concluded that the ICPC applied to the placement of R.S. with T.S. and it could not "go back" to answer any questions of fitness on the part of T.S. Rather, the juvenile court deferred to the ICPC report prepared by the Delaware social worker and awarded joint custody to T.S. *and* his parents.

As the Court of Special Appeals opined, the lack of relationship alone was insufficient to support an implicit finding that T.S. was unable to care for the child. T.S. was a willing and active participant in the CINA proceedings and demonstrated a desire

37

for custody of his child. As the Department concedes, T.S. "willingly presented himself as a resource" for R.S., entering into a services agreement with the Department and undergoing psychiatric and substance abuse evaluations. By the final dispositional hearing in June 2017, R.S. was spending weekends with T.S. at his home. It was clear from the record that, at the time of the custody determination, R.S. considered T.S. her father and was comfortable with him. We must also note that the parties disagree regarding whether T.S. preferred to share custody. We concur with the Court of Special Appeals that an additional hearing on that point is warranted.

## CONCLUSION

We hold that the ICPC does not apply to out-of-state placements with non-custodial biological parents, whether the court, a local social services department, or another relative, sends the child out-of-state to reside with the non-custodial, biological parent. Additionally, because the ICPC does not apply under these circumstances and the court never determined that T.S. was unfit, the CINA order was properly vacated. Accordingly, we affirm the judgment of the Court of Special Appeals.

**JUDGMENT OF THE COURT OF SPECIAL APPEALS IS AFFIRMED. COSTS TO BE PAID BY PETITIONER WORCESTER COUNTY DEPARTMENT OF SOCIAL SERVICES.**